MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS,
OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

I. STATEMENT OF THE CASE

In this action, plaintiff Milton Kaopua asserts that he was unlawfully discriminated against based on his race (Hawaiian), religion (Christian) and mental disability in that the Navy failed to respond appropriately to a threat against him by a co-worker and failed to accord him leave and workers' compensation benefits and reasonable accommodation of a claimed disability.

Specifically, plaintiff Kaopua asserts that the Navy subjected him to a hostile work environment from November 1998 until his mandatory retirement in April 2004; that the Navy denied his request for reasonable accommodation for his mental disability; that the Navy delayed, misprocessed and interfered with his Office of Workers' Compensation Program (OWCP) claims; and that the Navy failed to inform him of proper leave procedures, failed to timely process his leave requests and denied his leave requests, all because of his race (Hawaiian), his religion (Christian), and his mental disability.

The record reflects, however, that plaintiff's claims (other than that related to an asserted lack of reasonable accommodation) were untimely filed, and that without respect to timeliness, all these claims were (and are) unmeritorious. Nothing in the record, including the EEOC proceedings records, supports a claim that Navy personnel did anything to Mr. Kaopua based on his alleged race or religion, or based in any improper way on his medical or handicapping conditions. Nor can Mr. Kaopua produce evidence outside the written record suggesting

discrimination.

The facts of the case are set out in the Concise Statement filed concurrently herewith and are reflected succinctly in Administrative Judge Jeanne M.L. Player's DECISION GRANTING SUMMARY JUDGEMENT PURSUANT TO 29 C.F.R. § 1614.109(G) issued on February 26, 2004, [Ex 31][1] and in more detail in the OCI-Honolulu Report of Investigation dated August 20, 2003, parts of which are cited herein.  None of these facts appear disputed by plaintiff. Briefly recapitulated, those facts are as follows:

II.   SUMMARY OF UNDISPUTED FACTS

At all times relevant to his claims in this action, plaintiff, Milton K. Kaopua, was employed by the Federal Fire Department at Naval Station, Pearl Harbor, as a Supervisory Firefighter, GS-0081-07 (Fire Captain).  His immediate supervisor (and the immediate supervisor of Captain Abad) was Assistant Fire Chief Glenn DeLaura.  [Ex 1 at 2].  The Fire Chief of the Federal Fire Department was Michael P. Jones, GS-0081-14.[2]

Plaintiff Kaopua retired from Federal service on April 24, 2004, at the mandatory retirement age for Federal Fire Department employees.  [Compl., ¶ 42].

On October 10, 2001, Mr. Kaopua was assigned as Fire Captain on Shift A at Fire Station 11 at the Naval Ammunition Depot at Lualualei, Oahu.  There are two shifts, A and B, for firefighters

---

[1] The exhibits relied upon herein are attached to the concurrently filed Concise Statement.
[2] Both Fire Chief Jones and Assistant Fire Chief DeLaura are of Hawaiian ancestry.

at Station 11.  The Fire Captain for Shift B was Robert F. Abad. [Ex 1 at 2].

Captain Abad and Mr. Kaopua did not get along and as of October 10, 2001, an atmosphere of mutual distrust and dislike had existed for some time.  Plaintiff asserts that he had complained on many occasions to his superiors that Captain Abad was improperly using Government property to maintain pigs, escargot and fish, but that his superiors never took appropriate action.  [Ex 3 at 66-67].

The triggering event for this action occurred on October 10, 2001.  On that date, Captain Abad spoke with Colin A. Hallberg, a police officer with the Naval Station Pearl Harbor Security force, to file a "breaking and entering" complaint against Mr. Kaopua for cutting and removing a lock which Captain Abad had placed on an ice machine at the station.  Plaintiff and Captain Abad had different views concerning the ownership of the ice machine and Captain Abad's right to prevent its use by others. [Ex 2 at 206-210].

The police officer told Captain Abad that the ice machine was government property and that Captain Abad had no right to lock it, and a few days later, Captain Abad withdrew the complaint.  During his meeting with Officer Hallberg, however, Captain Abad said that he (Captain Abad) was tired of Mr. Kaopua and added "I guess I'll just have to shoot him."  Officer Hallberg suggested that it was not smart to make such a remark to a police officer and Captain Abad replied, "Well, that's what it

is coming to."   [Ex 2 at 209-210].

Three days later, on October 13, Officer Hallberg reported Captain Abad's statements to Mr. Kaopua, who said he was going to contact Chief DeLaura, his supervisor.  Four days after that, while talking with Chief DeLaura on an unrelated matter, plaintiff reported the threat.  [Ex 2 at 210].

On October 27, 2001, Mr. Kaopua went on sick leave and remained on sick leave until November 22, 2002.  [Ex 3 at 62, 64].  During this time he sought medical attention and was eventually diagnosed with "adjustment disorder with mixed anxiety and depressed mood, but strong post traumatic stress symptoms as well."  He was treated with a course of psychotherapy.  [Ex 6]. He sought and received workers' compensation from the Navy as well as donations of leave and advanced leave, and these were granted, although there were some errors, delays and misunderstandings in the processing of these requests.  [Ex 10].

On November 13, 2001, because of the above-described conflict, Mr. Kaopua and Captain Abad were both transferred from Fire Station 11.  Plaintiff was transferred to Fire Station 14B and Captain Abad was transferred to Fire Station 9A.  [Ex 8].

Mr. Kaopua was never satisfied with the Navy's response to Captain Abad's actions or its processing of his various requests. He was also dissatisfied with the difficulties and delays in processing his claims for workers' compensation and for donations of leave, as well with the course of discussions of the need for and character of reasonable accommodations by defendants of Mr.

-4-

Kaopua's claimed mental disability of which he complained. Plaintiff attributes these dissatisfactions to discriminatory animus on the part of defendants. [Ex 3 at 59-75].

III. PROCEDURAL HISTORY

Mr. Kaopua first contacted an EEO Counselor on July 25, 2002. [Ex 1]. His initial interview was on August 8, 2002 and his final interview, noting that the complaint had not been resolved and advising Mr. Kaopua of his right to file a formal complaint, took place on September 18, 2002. [Id.] His Formal Complaint was filed on October 3, 2002 and the Office of Complaint Investigations (OCI) Report of Investigation was issued on August 20, 2003. [Id.]

Plaintiff requested a hearing before an Administrative Judge (AJ) and on February 26, 2004, the AJ determined that a decision without a hearing was appropriate and issued her decision finding (a) that three of plaintiff's claims (hostile work environment, mishandling of the OWCP claim and processing of leave requests) had been untimely filed, and that even if the claims had been timely filed, they were unmeritorious because no discrimination had occurred; and (b) that plaintiff's remaining claim (denial of reasonable accommodation) was factually unsupported and that the agency did not fail to provide plaintiff with reasonable accommodation. [Ex 31].

The Navy's Final Order implementing the AJ's decision in the Navy's favor was issued on April 15, 2004. [Ex 32]. Plaintiff appealed to the EEOC which issued a decision on September 15,

2004 sustaining the AJ's decision and affirming the Agency's final order. [Ex 33]. Plaintiff then filed this action in the District Court.

IV. **LEGAL ANALYSIS**

    A.    <u>Standard of Review</u>

The U. S. District Court reviews de novo the decision of the EEOC on a charge of discrimination in violation of Title VII.

    B.    <u>Claimed Violations of Title VII</u>

        1.    <u>Timeliness</u>

29 C.F.R. § 1614(a)(1) provides that "[a]n aggrieved person must initiate contact with [an EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45 days of the effective date of the action." Mr. Kaopua claims that he was subjected to a hostile work environment beginning in 1998 and continuing until October 2002.[3] It is unquestioned, however, that if a hostile work environment ever existed, it ceased to exist when plaintiff commenced his period of extended leave on October 27, 2001, and this cessation necessarily continued during that period of leave which ended on November 22, 2002. Plaintiff's failure to contact an EEO Counselor until July 25, 2002, months after the allegedly hostile work environment commenced and terminated, places this

---

[3] Plaintiff's complaint alleges that the hostile work environment continued until his retirement in 2004. None of his allegations relating to this later period, however, were presented as discrimination claims to the agency for investigation and adjudication. These complaints thus cannot serve as a basis for the instant suit.

-6-

claim beyond the period of jurisdictional timeliness.

With respect to plaintiff's claim that his workers' compensation claim was mishandled based on discriminatory animus, it is undisputed that plaintiff submitted a Traumatic Injury and Claim for Continuation of Pay/Compensation (CA-1) form which shows a date of injury of October 13, 2001, and a date of the notice of November 26, 2001.  [Ex 11].  The agency controverted this claim because it was not submitted within 30 days of the injury and it would appear that the completed forms were not sent to the Department of Labor, Office of Workers' Compensation Programs (OWCP) until March 2002.  The Department of Labor concluded that the claim was more properly classified as an occupational injury than as a traumatic injury, and this decision required the completion of different claim paperwork, but in time the claim was accepted and approved.  [Ex 12].

The discriminatory act alleged by Mr. Kaopua is the agency's failure to submit his OWCP claim to the Department of Labor until March 2002.  Plaintiff's delay from March 2002, until July 25, 2002, in making contact with an EEO Counselor far exceeds the 45-day jurisdictional period.

With respect to Mr. Kaopua's claim of allegedly discriminatory delay by defendants in the processing of his application for participation in the Voluntary Leave Transfer Program, the undisputed facts are that plaintiff's application was submitted to the Navy on January 24, 2002, and was approved by the Commanding Officer, Naval Station Pearl Harbor on February

15, 2002. The leave transfer announcement was issued on February 19, 2002. [Ex 14]. Mr. Kaopua was aware of this approval not later than mid-March 2002. [Ex 15]. Plaintiff further complains that he was not properly informed about the correct sick leave procedures as to which the Navy made decisions of which plaintiff was aware in February 2002. [Ex 3 at 72]. Again, his delay until July 25, 2002, in contacting an EEO Counselor bars his claim.[4]

> 2. Plaintiff's Claims of Race, Religion and Disability Discrimination

In an employment discrimination case alleging disparate treatment, the complaining party has the burden of proving by an overall preponderance of the evidence that a violation of Title VII has occurred. See Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). Plaintiff's proof may be direct or circumstantial. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985).

The general rules governing the order and allocation of proof in an individual action alleging that an employment decision was discriminatory were first set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). McDonnell Douglas holds that a Title VII plaintiff must carry the initial burden of

---

[4] In her Decision Granting Summary Judgment, the Administrative Judge pointed out that with respect to his claims of a hostile work environment, mishandling of his OWCP claim and delay in obtaining approval for him to be a Leave Recipient under the Voluntary Leave Transfer Program, Mr. Kaopua failed to make timely contact with an EEO Counselor and that those claims must be dismissed. See Ex 31 at 7-8, 10-12.

proof by establishing a *prima facie* case of discrimination.  Id. at 802.

          a.   Circumstantial Evidence of Discrimination.

Where the plaintiff alleges employment discrimination based on circumstantial evidence, summary judgment is appropriate if the plaintiff cannot establish an essential element of a *prima facie* case or, if there is a *prima facie* case, when he fails to present specific evidence that the employer's nondiscriminatory reason for an adverse employment action was pretext for discrimination.  See, e.g., Warren III v. City of Carlsbad, 58 F.3d 439, 443 (9th Cir. 1995) (ruling that summary judgment is appropriate in a Title VII case when a plaintiff cannot establish a *prima facie* case or raise a genuine issue of fact as to pretext).

If a *prima facie* case is established, "the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employee's rejection."  Burdine, 450 U.S. at 253 (quoting McDonnell Douglas, 411 U.S. at 802).  It is important to note, however, that although the McDonnell Douglas presumption shifts the burden of production to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." (emphasis added).  Id.

In order to prevail on motion for summary judgment once the defendant has articulated a legitimate, non-discriminatory reason

for its action, plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory. Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994) (quoting from Lowe, 775 F.2d at 1005). Plaintiff "must tender a genuine factual issue of material fact as to pretext in order to avoid summary judgment." Id. (quoting Steckl v. Motorola, Inc. 703 F.2d 392, 393 (9th Cir. 1983). This means that plaintiff "must do more than establish a prima facie case and deny the credibility of the [Respondent's witnesses;" he must offer "specific and significantly proactive evidence" that the proffered reasons are pretextual. Schuler v. Chronical Broadcasting Co., 793 F.2d 1010, 1011 (9th Cir. 1986). "A plaintiff can show pretext in two ways, 'either (1) directly by persuading the court that a discriminatory reason more likely motivated the employer or (2) indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Cotton v. City of Alameda, 812 F.2d 1245, 1248 (9th Cir. 1987) (quoting Burdine, 450 U.S. 256).

At no time during the administrative proceedings or in his pleadings in this case has Mr. Kaopua sought to establish disparate treatment as a basis for his claim of discrimination. Nowhere is there any specific allegation or proffered evidence concerning the Navy's unequal treatment of anyone else similarly situated. Instead, plaintiff offered what he promotes as direct evidence of discrimination. In so doing, he directly and affirmatively establishes the insufficiency of his own case.

-10-

    b. <u>Direct Evidence of Discrimination</u>

  The <u>McDonnell Douglas</u> analysis does not apply in every case of alleged employment discrimination. As noted by the Court in <u>Trans World Airlines, Inc.</u>, 469 U.S. at 121, "[T]he <u>McDonnell Douglas</u> test is inapplicable where the plaintiff presents direct evidence of discrimination." In this case, as noted above at pp 13-15, Mr. Kaopua sought to explain precisely why he believed discrimination to have existed. These explanations never rose above the level of "accusations and speculation," all of which the AJ found insufficient to raise an inference of unlawful discrimination.

  Mr. Kaopua, in his sworn testimony to the Navy's investigator during the formal investigation of his complaint (Ex 3 at 59-75), articulated his grounds for claiming race, religion and handicap discrimination. Plaintiff's stated basis for his allegations that the Agency subjected him to a hostile work environment because of his race and national origin is set out at Ex 3 at 65:

> One of my men died in 1998 or 1999 and his name was David Reid – he was Hawaiian. He died on duty and I was not at work that day. The men went out to buy more beer and the car flipped over and David Reid was killed. After the incident, I talked to Chief Gilding and asked him what they were going to do because my men were drinking and he said they weren't going to do anything. I think that because Mr. Reid was Hawaiian, they just shoved the matter under the table and didn't take any action. If Mr. Abad had killed me they probably would have shoved that under the table, too. The Acting Captain, when David was killed, was Kimo Lake and nothing

-11-

>> happened to him, probably because he isn't Hawaiian.

Plaintiff does not allege, and the record does not show or suggest, that he was subjected to a hostile work environment based on his race, national origin, religion, or disability. When Mr. Kaopua was asked for proof that he was subjected to a hostile work environment because of his religion, plaintiff stated (Ex 3 at 65-66):

> When I called Chief DeLaura on November 4, 2001 and told him that my doctor wanted to know the status on Abad and what was being done to protect me, he told me that I should not bother Captain Abad because he is a good man and he said you know that Captain Abad relieves you to go to church. I told him that church and religion had nothing to do with this. He should not have said anything about religion.

When Mr. Kaopua was asked for proof that he was discriminated against because of his mental disability, plaintiff stated [Ex 3 at 66]:

> They thought I wasn't going to do anything. It was wrong what Abad did and they did nothing to correct the problem. They would not give me a safe work place.

The foregoing is the sum total of the evidence offered by plaintiff under oath to support his claims of racial, religious and handicap discrimination by establishment of a hostile work environment. There is no scintilla of proof throughout the administrative process, and there are no allegations in the pleadings in this court, to connect any action complained of by plaintiff to any discriminatory animus on the part of any Navy

official or employee.

There is a similar void with respect to Mr. Kaopua's other claims of discriminatory treatment. In his sworn statement during the formal Navy investigation with respect to his claim of delays in processing his OWCP claim, plaintiff asserted that Fire Chief Michael Jones, Chief DeLaura and Human Resources Office employee Hazel Wong were the discriminating officials. [Ex 3 at 69]. The following exchange with the investigator took place [Ex 3 at 70]:

43. What is your proof that Chief Jones, Chief DeLaura, Chief Kaauwai [another supervisor] and Hazel Wong were motivated by your:
a.   Race and national origin -
[Answer:] The same proof I already stated above.
b.   Religion -
[Answer:] The same proof I already stated above.
c.   Mental disability -
[Answer:] The same proof I already stated above.

When questioned about the remaining allegations of discriminatory treatment, Mr. Kaopua offered identical references to his earlier testimony concerning the alleged hostile work environment: his sworn testimony on his claim that management failed to inform him of correct sick leave procedures and rights, failed to timely process the request and denied his request for advance sick leave [Ex 3 at 71-72]; as well as his sworn testimony on his claim that he was not informed of correct leave transfer program procedures. [Ex 3 at 72-73]. Mr. Kaopua, however, has entirely failed to show or even provide a reasonable inference that invidious discrimination motivated, in whole or

part, management's treatment of him.

The Administrative Judge correctly concluded that even if the complaints had not been untimely, they would have been found wanting. With respect to the claim of a hostile work environment, the AJ stated:

> Even if this claim were considered on the merits, the complainant has failed to present evidence from which a reasonable fact finder could infer that he was required to work in an environment permeated with intimidation, ridicule, and insult that was sufficiently severe or pervasive [as] to alter the conditions of his employment and create an abusive working environment. The facts in the record also fail to raise an inference that any conduct by agency officials was because of the complainant's Hawaiian background, his Christian religion, or any other unlawful factor.
>
> Ex 31 at 8-9, fn. 1.

With respect to the claim of mishandling of Mr. Kaopua's OWCP claim, the AJ stated, "Even if the claim were considered on the merits, the record contains no factual evidence from which a fact finder could infer that the agency's delay in submitting this claim was attributable to Mr. Kaopua's membership in any protected class. The complainant's accusations and speculation concerning the motives of agency officials are not sufficient to raise such an inference." [Ex 31 at 11, fn. 3]. Finally, as to the claim concerning delay with respect to sick leave, the AJ observed, "This claim would be subject to summary disposition even if it were considered on the merits because the complainant has failed to show that the agency's action materially altered the terms, conditions, or privileges of his employment."

Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998).  As the complainant could not establish that the agency took an adverse action against him, he could not establish a prima facie case of discrimination on any basis."  [Ex 3 at 12, fn. 4].  The federal defendant respectfully submits to this Court that the Administrative Court's analysis of the undisputed evidence was indeed correct.  This Court is respectfully requested to make a similar ruling and bring this unworthy litigation to a proper conclusion.

       3.    Plaintiff's Claim of Denial of Reasonable Accommodation.

Section 105 of the Rehabilitation Act of 1973, 27 U.S.C. § 791, as amended by the Rehabilitation Act Amendments of 1992, 29 U.S.C. § 791(g), requires Federal agencies to take affirmative steps to ensure that individuals with disabilities have equal access to employment opportunities in the federal government.  A qualified individual with a known disability is entitled to reasonable accommodation, unless the employer can show that accommodation of the disability would cause it undue hardship.  29 C.F.R. 1630.2.  Once an employer knows of an employee's disability and the employee has requested reasonable accommodation, the ADA and its implementing regulations require that the parties engage in an interactive process to determine what precise accommodations are necessary.  Both parties bear responsibility for determining what accommodation is necessary.  In the event the interactive process fails, the Court shall

determine which party is responsible for the breakdown and then assign responsibility for the failure in deciding whether the employer's decision to deny the accommodation was warranted. Beck v. University of Wisconsin Board of Regents, 75 F.3d 1130, 1135-37 (7th Cir. 1996).

It should be noted at the outset that the facts established to date in Mr. Kaopua's affidavits affirmatively show that he is not and was not disabled with the meaning of the Rehabilitation Act. The Act defines "disability" at 29 U.S.C. § 705(20) as follows:

> **(B) Certain programs; limitations on major life activities** Subject to subparagraphs (C), (D), (E), and (F), the term "individual with a disability" means, for purposes of . . . subchapters II, IV, V, and VII of this chapter, any person who—
> **(I)** has a physical or mental impairment which substantially limits one or more of such person's major life activities;
> **(ii)** has a record of such an impairment; or
> **(iii)** is regarded as having such an impairment.[5]

Mr. Kaopua's sworn testimony in the Navy's administrative proceedings shows that the only limitation of "major life activities" to which he was subject following his return to work was working in an environment that included Captain Abad. This is not the sort of limitation which constitutes a disability under the Rehabilitation Act. In "[I]t is well-established that

---

[5] The Americans with Disabilities Act, 42 U.S.C. § 12102(2), similarly provides that:
The term "disability" means, with respect to an individual—
**(A)** a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
**(B)** a record of such an impairment; or
©) being regarded as having such an impairment.

the inability to work with particular co-workers or supervisors does not create a substantial limitation on the major life activity of working." Newby v. Whitman, 340 F.Supp.2d 637 (M.D.N.C. 2004). 29 C.F.R. 1630.2(j)(3)(I) confirms that '[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." See also Weiler v. Household Finance Corporation, 101 F.3d 519, 524-25 (7th Cir. 1996) ("The major life activity of working is not 'substantially limited' if a plaintiff merely cannot work under a certain supervisor because of anxiety and stress" and if plaintiff "can do the same job for another supervisor, she can do the job, and does not qualify under the ADA"); Siemon v. AT&T Corp., 117 F.3d 1173, 1176 (10th Cir. 1997) (holding that a mental impairment preventing plaintiff from "working under a few supervisors within the organizational structure of one major corporation ... is far too narrow to constitute a 'class of jobs.' "); Palmer v. Circuit Court of Cook County, Ill., 117 F.3d 351 (7th Cir. 1997) ("[A] personality conflict with a supervisor or coworker does not establish a disability within the meaning of the disability law, ... even if it produces anxiety and depression, as such conflicts often do.").

In a letter to the Navy dated April 24, 2002, [Ex 23 at 242-243], Plaintiff's attorney complained of the agency's "failure . . . to demonstrate any immediate efforts at meaningful reasonable accommodation" for plaintiff. In follow-on correspondence with plaintiff's attorney [Exs 24; 25; 26], Navy officials sought to

determine what "reasonable accommodation" was desired. Plaintiff's attorney referred repeatedly to Mr. Kaopua's need for a "safe" work place at station #11, his former place of work. On September 16, 2002 [Ex 27], Hazel Wong, a Navy labor advisor, notified plaintiff's attorney of a number of measures put in place to assure plaintiff's safety by preventing any contact with Captain Abad. The following extract from that letter illustrates some of these measures:

> As I explained in our phone conversation on August 27, the Fire Department has ensured Mr. Kaopua's safety by removing Mr. R. Abad from the Lualualei Fire station. This should preclude any contact because the stations the two employees are at do not back up each other. Mr. Abad is assigned to the Iroquois Point Fire Station, which is approximately 20.6 miles away from the Lualualei Fire Station. . . . The Lualualei and Iroquois Point fire crews would not respond to the same emergency, since both fire crews are stationed in areas with munitions and cannot leave the area. If there is an emergency in either area in which more than one fire crew must respond, the Barbers Point fire crew will respond, as well as the Manana fire crew, if needed.
>
> The Area Chiefs are aware of Mr. Kaopus's Temporary Restraining Order (TRO) and will continue to make all reasonable efforts to assure there is no contact at work between Messrs. Abad and Kaopua. The Area Chiefs will inform all supervisors in all areas that Mr. Abad is not to have contact with Mr. Kaopua. Also, the Fire Department does not see any need for Mr. Kaopua to contact or deliver items to the Iroquois Point Fire Station when Mr. Abad is there. If such should occur, Mr. Kaopua may contact the Area Chief or assign a crew member to arrange contact or delivery. The mandatory separation also would not restrict overtime opportunities, since they are both Fire Captains; only one Fire Captain is assigned per crew; and overtime fill-ins can be arranged by

>     the Area Chiefs so they are not at the same
>     stations.

These and the other measures taken by the Navy in response to the conflict between Captains Abad and Kaopua may not have been necessary under the law to accommodate plaintiff's questionable disability, but they were reasonable (and perhaps more than reasonable) as a matter of pragmatic and sensible management of two incompatible employees.  They also permitted the Administrative Judge evaluating Mr. Kaopua's claim to conclude, on the basis of undisputed evidence in the record, that even assuming plaintiff was disabled and required reasonable accommodation of his disability, defendants in fact provided all the accommodation what was required.  She stated, "The only inference to be drawn from these undisputed facts is that the agency did not fail to provide the complainant with a reasonable accommodation."

Those same undisputed facts are before this Court through the exhibits filed herewith, including sworn testimony of plaintiff and others referred to above, and a similar conclusion by this Court is fully justified.

V.   CONCLUSION

Mr. Kaopua's complaint entirely fails to allege any material facts which either directly show the existence of unlawful discriminatory animus on the part of defendants toward plaintiff or provide a basis for inferring from disparate treatment that such discriminatory animus existed.  Moreover, plaintiff has in

his own sworn testimony during the agency investigation demonstrated that he has no basis in fact for his belief that he was the victim of prohibited discrimination by his agency or any of its officials. As to his complaint concerning reasonable accommodation of his disability, the undisputed facts show that even if Mr. Kaopua was disabled and entitled to reasonable accommodation, he received everything to which he was entitled, and perhaps more. Accordingly, Mr. Kaopua's complaint should be dismissed, or in the alternative, summary judgment should be entered for defendants.

DATED: March 15, 2006, at Honolulu, Hawaii.

>EDWARD H. KUBO, JR.
>United States Attorney
>District of Hawaii
>
>By  /s/ R. Michael Burke
>    _____
>    R. MICHAEL BURKE
>    Assistant U.S. Attorney
>
>Attorneys for Defendant