# Exhibit 10

Name: Patti K. DeVita

# AFFIDAVIT

State of Hawaii
County of Honolulu

I, Patti K. DeVita, at Pearl Harbor, Hawaii, make the following statement under oath or affirmation. Pursuant to Public Law 93-579 (Privacy Act of 1974), as an individual supplying information for inclusion in a system of records, I have been informed of the following:

EFFECTS OF NONDISCLOSURE: Disclosure of information by me is voluntary; however, I realize my failure to respond could result in a recommended disposition of the case on the basis of information available. Witnesses who are Department of Defense employees may be subject to administrative action for failure to testify.

AUTHORITY: The authority to collect the information requested by this interview is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.

PURPOSE AND USES: The information supplied will be used as part of the record in an equal employment opportunity discrimination complaint or grievance investigation. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint or grievance. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Office of Personnel Management or Department of Defense activities, to the Federal intelligence agencies, or to others as published in the Federal Register.

1. What are your current position title, series, and grade level, and how long have you held this position?

I am Human Resources Specialist, GS-0201-11, and I have held this position for approximately 18 years. I am responsible for managing worker's compensation claims under the Federal Employee's Compensation Act.

2. Who are your first and second level supervisors?

My first line supervisor is Connie Holladay and my second level supervisor is the HRO Director, Nadine Bayne.

NAME: Patti K. DeVita

3. What are your major duties and responsibilities with respect to the OWCP program? Who do you rely on for advice and guidance?

I am responsible for case management and I also do briefings, etc. I rely on either the Worker's Compensation instructions and Website or contact the Department of Labor in San Francisco.

4. Mr. Kaopua says management delayed, misprocessed, and interfered with his OWCP claim. Was it delayed and/or misprocessed? What do you remember?

There was a problem with his original form and what happened to it. I only received a zeroxed copy of his CA-1 form and it was not completed, so I probably returned it to the department's administrative office. At this point in time, that was Lani Salis. I asked for the original form and I was told that they weren't sure what happened to it.

5. Mr. Kaopua's claim is dated 11/26/01 but it appears that you did not receive it until 12/31/01. Is this correct? Where was it between 11/26 and 12/31?

I don't know, but I did contact the Fire Department to ask for the original document once I got it. I don't remember asking anyone where it was for one month. It seems that they didn't know what happened to it. But this does happen occasionally and we usually just try to track it down.

6. Explain your comment that there was a misunderstanding as to which type of form was appropriate. Did Mr. Kaopua or his attorney ask you about the correct form to use before Mr. Kaopua submitted the form? Did Mr. Kaopua contact you at any time prior to 12/31 to get your guidance or assistance?

I don't remember talking to Mr. Kaopua or his attorney about this matter – they never contacted me. When I looked at the CA-1 it occurred to me that it may not have been a traumatic claim and he probably should have filed a CA-2, because stress claims are usually more than a one-day incident and it is ongoing. I think I mentioned this to Chief Gilding and Chief DeLaura. I asked them to find out what happened and what he is claiming since it did not

NAME: Patti K. DeVita

3. What are your major duties and responsibilities with respect to the OWCP program? Who do you rely on for advice and guidance?

I am responsible for case management and I also do briefings, etc. I rely on either the Worker's Compensation instructions and Website or contact the Department of Labor in San Francisco.

4. Mr. Kaopua says management delayed, misprocessed, and interfered with his OWCP claim. Was it delayed and/or misprocessed? What do you remember?

There was a problem with his original form and what happened to it. I only received a zeroxed copy of his CA-1 form and it was not completed, so I probably returned it to the department's administrative office. At this point in time, that was Lani Salis. I asked for the original form and I was told that they weren't sure what happened to it.

5. Mr. Kaopua's claim is dated 11/26/01 but it appears that you did not receive it until 12/31/01. Is this correct? Where was it between 11/26 and 12/31?

I don't know, but I did contact the Fire Department to ask for the original document once I got it. I don't remember asking anyone where it was for one month. It seems that they didn't know what happened to it. But this does happen occasionally and we usually just try to track it down.

6. Explain your comment that there was a misunderstanding as to which type of form was appropriate. Did Mr. Kaopua or his attorney ask you about the correct form to use before Mr. Kaopua submitted the form? Did Mr. Kaopua contact you at any time prior to 12/31 to get your guidance or assistance?

I don't remember talking to Mr. Kaopua or his attorney about this matter – they never contacted me. When I looked at the CA-1 it occurred to me that it may not have been a traumatic claim and he probably should have filed a CA-2, because stress claims are usually more than a one-day incident and it is ongoing. I think I mentioned this to Chief Gilding and Chief DeLaura. I asked them to find out what happened and what he is claiming since it did not

NAME: Patti K. DeVita

appear to be a traumatic injury. I asked them to get statements from the supervisors and/or any witnesses who were knowledgeable about what happened.

7. You said you returned the form to the Federal Fire Department so the supervisor could fill out the relevant portion and you did not get it back until 3/13/02. Explain what the supervisor needed to do and what happened between 12/31 and 3/13 to cause the delay?

They could never locate the original CA-1 form, so I had Chief DeLaura come in to re-sign the form and he turned in his statement. During the January to March timeframe, Chief DeLaura needed to locate the CA-1 form and get more information on what happened and get statements from witnesses or anyone who was involved who may have knowledge about what happened and what occurred. When I spoke him again before March, he stated that he was still investigating the claim and would get all the necessary information to me as soon as possible. It was an unusual case and Chief DeLaura was not quite sure about what he needed to do and it took a while to gather all the information. They could never locate the original form, so at the time that Chief DeLaura turned in the claim with the statements, I had him resign his name. Because of the timeframe, and because Mr. Kaopua was off from work, I just went ahead and turned it in to OWCP.

8. When did you tell Mr. Kaopua that he needed to file another claim?

I did not actually talk to Mr. Kaopua. Since I wasn't sure if it was an occupational claim or a traumatic injury, I turned it in as is.

9. Is this considered two claims or one claim? Did he file any other OWCP claim?

He only filed one claim and when it went to OWCP they determined that it was an occupational injury and converted it to an occupational injury claim.

10. Mr. Kaopua says management interfered with his OWCP claim. Any truth to this?

I never saw it this way. I never felt that it was interfered with or held back intentionally because this happened before with the Fire Department. I think this is because there are so many steps and a lot of people involved. My understanding is that it goes from the employee to the supervisor, from the supervisor to admin, from admin to the one of the Chiefs for

*Page 3 of 7 pages*                             Affiant's Initials: _____



112

NAME: Patti K. DeVita

review, a copy is made, then sent to us. We occasionally receive a zeroxed copy by mistake. We did ask Chief Jones to change the process so that the original form is now sent directly to me.

11. Was his request processed slower than anyone else's – particularly another employee in the Fire Department? Who was responsible for the delay?

I'm not sure, but we have had similar problems in the past. I don't know who was responsible for the delay.

12. Did Chief Jones or Chief DeLaura have any direct involvement in the delay – did they contribute to the delay or cause the delay?

I don't think so.

13. Did management officials support or controvert the claim?

The claim was controverted by Chief DeLaura because Mr. Kaopua did not file his CA-1 until 30 days after the date of alleged injury. Claims that are over 30 days are automatically controverted.

14. How are Complainant's rights and benefits affected by the determination by OWCP that it was an occupational injury rather than traumatic injury?

The only difference is that the CA-1 provides for the initial 45-days of continuation of pay; the employee is not charged with annual or sick leave during the initial 45 calendar days. The employee receives his regular salary. Once the claim is accepted, OWCP pays for medical expenses and other appropriate benefits and lost time from work at the 75% rate. Because Mr. Kaopua's claim was late, he would not have been eligible for the continuation of pay. Since OWCP determined that this was an occupational injury, Mr. Kaopua was not eligible for continuation of pay. CA-2 claims entitle the employee to appropriate medical expenses, compensation for leave without pay, and some other appropriate benefits.

15. What do you mean when you said Mr. Kaopua was given the opportunity to buy back his sick or annual leave at the appropriate reduced rate? Did he do this?

NAME: Patti K. DeVita

This means that whatever leave he initially used, he would have to return the money to payroll and OCWP will reimburse him, up to 75% of that amount. What usually happens is that OWCP calculates the leave and cuts a check which is sent to the payroll office and payroll calculates the 25% that the employee owes. I don't know if Mr. Kaopua bought back his annual or sick leave.

16. It appears that he also applied for leave under the Leave Transfer Program and someone told Mr. Kaopua that he had to choose between being in the leave transfer program and receiving worker's compensation? It appears that he was told he was not eligible under LTP because he was receiving OWCP compensation. What do you know about this? Why would he have to choose? Why was he initially considered ineligible? Did you have any involvement in this determination – were you consulted?

When I found out that OWCP accepted his claim and he wanted to go on compensation, but he had also received leave donations, I called Flo Kaneda to confirm if he was in fact receiving leave donations. My concern was that I did not want the leave donations applied to the period that he was on leave without pay because you have to be on LWOP to receive compensation. You cannot receive both leave and compensation for the same timeframe – this is considered to be dual compensation. When I talked to Flo she assured me that the period that he was applying for was not for the same period that he received leave donations. I then contacted Lani and explained the leave donation and compensation to her and told her that someone should contact Mr. Kaopua to tell him that he can't have leave donations and compensation for the same period because this would constitute dual payment.

17. To your knowledge, was Complainant harmed by the delay in processing his OWCP forms? Did he get everything that he was otherwise entitled to?

As far as I know, he received everything that he applied for, but it could have been sooner if the forms were processed sooner.

18. Did Chief Jones or DeLaura ever say or do anything to indicate they would discriminate against Complainant for any reason?

No.

Patti K. DeVita

19. Did you discriminate against Mr. Kaopua for any reason?

No.

20. For the record, what is your race?

I am Japanese.

21. What is your national origin?

I am an American.

22 Do you know Mr. Kaopua's religion?

I know it now because I'm aware of his complaint, but I didn't know it then.

23 What do you identify with in terms of religion?

I am a Buddhist.

24. Did you discriminate against him because of his mental disability?

No.

25. Do you have a disabling condition?

No.

26. Do you have anything else to add?

No.