# EXHIBIT "F"

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
OFFICE OF FEDERAL OPERATIONS

| | |
|---|---|
| MILTON KAOPUA, | ) DOCKET NO. 01A43922 |
| | ) |
| Appellant, | ) EEOC Case No. 370-2003-02350X; |
| | ) Agency Case No. 03-62813-001 |
| vs. | ) |
| | ) ATTACHMENTS |
| Department of the Navy, | ) |
| | ) Date: August 20, 2004 |
| Respondent Agency. | ) |
| | ) |

H:\CLIENTS\Kaopua\Plead\08-20-04 Declaration of Milton Kaopua - for OFO Appeal Brief.wpd

## DECLARATION OF MILTON KAOPUA

I, Milton Kaopua, do hereby declare as follows:

1. My name is Milton Kaopua and I am the Complainant-Appellant in this matter. I make this declaration to supplement the record regarding matters ruled upon by the EEOC administrative judge about which I had never been questioned by the Navy-EEO or its OCI investigator during my complaint processing.

2. I recently retired as a Captain (Supervisory Firefighter, GS-0081-07) with the Federal Fire Department, Department of the Navy, Naval Station, Pearl Harbor, Hawaii, having reached mandatory retirement age with 35 years of service. I was employed by the Naval Station Federal Fire Department since 1969; I became a captain in 1985 and I served as Captain at Station 11 for over 3 years. At the time of my retirement I am still being covered by OWCP for medical care relating to my 2001 on-the-job illness/injury.

3. Following my work related illness/injury incident (notice to me of the death threat from Fire Capt. Abad) I became extremely upset and disoriented; I sought medical attention from my primary care physician, Herminio Mercado, M.D. who prescribed medication and later referred me to a psychiatrist for treatment and evaluation of stress, acute anxiety reaction, and depression, taking me off work for an undetermined period of time. At that time I called the Fire Department, Acting Chief Kaauwai, and said I would be absent on "T/I" leave which I now know is called COP (Continuation of Pay) ("T/I" means traumatic injury, which is how we described work-related injury leave at the Fire Dept.). Chief Kaauwai said he was placing me on sick leave instead. I then told Chief DeLaura that I wanted to be placed on T/I and he said "no." I insisted and then I was given a form CA-1. Since I did not know how to use the form, I went to find a lawyer. No one from the Fire Dept or the Navy counseled me (or offered to help me) on how to fill out a CA-1.


EXHIBIT F

4. The first lawyer I saw was supposed to be an expert in workers compensation, but he was too busy to take my case and I am not sure he really did many federal workers' cases. The next lawyer I went to was more to help me with my State court TRO against Capt. Abad. At the court case for my TRO I learned that Capt. Abad had turned in a gun to the Police Department when he was served with my TRO papers. I become more afraid, depressed and despondent. I asked my TRO attorney to help me with my OWCP case, so he called the first attorney who had not done anything and took over the case. He completed the CA-1 which I then signed and hand carried it to my Station and handed it to Acting Capt. Harry Kiyan to call it in to be picked up in the normal every day mail run.

5. In mid December I was using up all my annual and sick leave and was still not receiving Continuation of Pay (which had again been requested on the CA-1 form given me by the Agency) or workers compensation. My then TRO lawyer referred to attorney Elbridge W. Smith, because he had expertise in federal employment cases. I called his office and first met with him and his staff just before the Christmas holidays and told them the problems I was having with OWCP, my continuing fear of Capt. Abad and my mounting medical and other expenses with no income. He said he would call the Navy, but everyone seemed to be gone for holiday leave. I think he spoke with someone at HRO and left messages. There was no thought in my mind of any discrimination, just getting well and getting my bills paid.

6. In January 2002, right after New Years, Mr. Smith told me that Navy HRO said that the Fire Dept had faxed the CA-1 to OWCP, but Navy OWCP said they had nothing. Mr. Smith asked me if I had requested advanced sick leave or leave transfer, but I did not know what those were or how to do it. He had HRO fax him the needed forms and a copy of the CA-1 which they had now found, but which need to be resigned because they could not find the original. The completed and re-signed CA-1 was still not transmitted to US Dept. Of Labor, ESA-OWCP in San Francisco by the Navy until "sometime in March, 2002."

7. On January 25, 2002 clinical psychologist Robert Davé, Ph.D. sent a letter to the Federal Fire Department (ROI, page 222) telling them of my psychiatric disability and the need for reasonable accommodation of a safe environment – "appropriate resolution to the ongoing threat of violence originating in Captain Kaopua's work environment." Neither Dr. Davé nor I (nor my attorney, nor my psychiatrist Shepard Ginandes, M.D.) received a reply, a request for more information, or a proposed resolution to the safety concerns.

8. On February 13, 2002 Fire Department Chief Michael Jones continued to deny me TI (COP) and limited my advanced sick leave to 9 days. My attorney Elbridge Smith complained to Navy HRO by email that my leave transfer request was not being honored, and threatened to file a formal administrative complaint. Again we had no thought of making a discrimination complaint, just an administrative complaint to the installation commander that they were making me suffer, lose pay and not properly processing my OWCP and leave requests. The Navy HRO checked and admitted the mistake on March 11, 2002. They then agreed the request was being reprocessed, and reported that someone had "donated 20 hours of leave to Mr. Kaopua and the donation is being processed now." In fact the donor, who

2

called me personally, was told I was not eligible for the program and leave transfer was refused, so I did not get it.

9. On April 18, 2002 attorney Smith advised me that he had just spoken with Navy HRO about the accommodation issue of my safety and was told that "management is taking action" but would not tell him what action that was. When asked to be specific, HRO's Hazel Wong told Mr. Smith "What we do about Capt. Abad is our business, not Mr. Kaopua's." HRO would not tell my doctors either.

10. When attorney Smith and I met in April 2002, we began to discuss all the problems and continued lack of responses from the Navy. As a result he wrote them a letter on April 24, 2002 to make a record of these problems and try and get a resolution to the safety concerns and the Navy's failure to provide us with records and documents about my employment. The Navy and my attorney exchanged several letters about how the Navy could or should meet my medical needs and what they were, which my lawyer tells me is called "reasonable accommodation." Instead of resolution, the Navy told us on May 3, 2002 that we had to deal with their JAG; discussion of "accommodation" continued but with no result, not even a proposal from the Navy. *See*, ROI at pp. 242 ff.

11. I was getting more and more depressed, angry, confused and in need of medical care. My wife and I scheduled a long meeting with attorney Smith and the OWCP Nurse (Jamie Neill) assigned to my case to discuss the lack of accommodation (safe environment) and how I could get back to work on July 18, 2002. We discussed the federal prosecution of Abad, the existing TRO, the supposed "Zero Tolerance Policy" on workplace violence, my several medical reports to the agency, the recent gunshot to my car window, my OWCP claim, COP and TI coverage, and why the Navy was still claiming it did not know what was wrong with me or what I or my doctors wanted for me. OWCP Nurse Jamie Neill advised me of her difficulties with communications with the Fire Department. Mr. Smith mentioned that the Navy JAG had just told him that my safety concerns were personal because I had filed a TRO and thus were not official employment issues. The OWCP nurse advised that if she could not get me placed back in the Fire Department quickly that OWCP would assign me to an rehabilitation specialist who would attempt to get me trained for a different job. That really upset me. I was a firefighter, nothing else, and I was close to mandatory (age 57) retirement. I could lose that if I was placed in a non-firefighter job.

12. Mr. Smith advised me that I had several options, including an EEO complaint for failure to accommodate, a disability retirement, and a whistleblower complaint because of my disclosures of Capt. Abad's illegal activities on and with government property. The procedures, the rights and the possible results were all discussed. I first was concerned about what OWCP would do about helping me get my job back. This July 18, 2002 conference was the first time I can recall my attorney advising me that the continued failure to accommodate my medical needs might be a violation of my EEO rights. I asked him more about EEO, what it is and what it covers? He gave me a short hand-out which summarizes EEO procedures and has a flow chart of times. He asked me if I had ever seen anything like this before, at an EEO training or posted on the bulletin board at work. I told him it did not

3

look familiar. (The Fire Department has posted all new notices and information on the bulletin boards just this past year, and one of those new postings looks something like the chart I got from attorney Smith, except the Navy one is much, much smaller – hard to read. It is page 18 of a 26 page bulletin, and that copy, which is one of the pages I posted, is attached here to my statement. I know this because I was the one assigned to do the posting at Fire Station 11 in February 2003, where I was working again until I retired this year.)

13. As we talked about all these issues of concern to me in that July 18 Meeting, particularly the Navy JAG attorney statement that this was personal and not employment related, the HR statement that no notice would be provided to me or my doctors about any personnel action would to be taken against Mr. Abad, that my leave and OWCP claims had been interfered with and delayed, and that no assurances of safety would be given to me or my doctors, we began to realize all these matters were not mere coincidences, not just random happenings, but seemed to be part of a Fire Department effort to harm me and get me out of the Department for good. It was not just me against Capt. Abad or the Assistant Chief DeLaura; it was like the whole Department against me. But why were they picking on me? Mr. Smith gave a another handout questionnaire and we talked about race, color, religion and things like that. Both Capt. Abad and Assistant Chief DeLaura are part Filipino. Maybe they don't like us Hawaiians I began to think. I then remember the death of a part-Hawaiian firefighter, Davey Reid, and how that was covered up. I asked Mr. Smith what can I do? What kind of complaint do I have to file to get some action?

14. When I filed my Incident Report with Base Security against Capt Abad it was my understanding that it would be sent through my chain of command, which is to Fire Chiefs Jones and DeLaura. So both Chiefs knew of my violence complaint as soon as I had filed it. I assumed they would deal with the threat because the Agency had a "Zero Tolerance Policy" concerning workplace violence. Also see my attached Declaration dated 10-26-01.

15. Attorney Smith said he would contact the Fire Department and find out who to contact to start the EEO process, since there was nothing posted that I remembered seeing. He did so that same day, July 18, 2002, by telephone call to Navy HRO Hazel Wong and then by fax. At that time he again asked about possible accommodation for my condition and safety. A few days later in July 2002 Mr. Smith faxed a more detailed letter to the Navy EEO office about all of this. On August 1, 2002 Mr. Smith told me our EEO Counselor David Gill had called him to arrange a meeting for my case.

16. After I started the EEO process, I had contact with an EEO Counselor David Gill on August 8, 2002, who came to Mr. Smith's office to interview me. I told all these things to him. He asked us why I was contacting them then, in July when some of these things happened the year before and I told him. I never thought of EEO and making a complaint before; my attorney showed him all the copies of the letters and notes about the conversations with Navy HR, the Navy JAG attorney, and the workers compensation people. I told Mr. Gill that every new day was a new day I did not get paid, a new day they would not let me work and a new day they gave preferential treatment to Mr. Abad and not to me as to where he could work. I told him we had all met with the OWCP nurse to figure our why the Navy would not help

me and keep doing things to hurt me more. That is when. I don't recall that the EEO-OCI investigator ever asked me about why I filed when I did, she never asked me why I was "late" in filing, never used that word "late"; she never asked what made me file this complaint now.

17. If I had been asked, I would have said that I decided to get an attorney when my "T/I" workers compensation claim was not being processed and I was without pay. I didn't complain about EEO or discrimination or not being given a better job location -- I had no job location. It was not in my mind. I just wanted to get my pay and get well, so I could get back to work. I believed in my heart that the Agency was going to take corrective action against Capt Abad because that was their official policy and it would be safe for me to come back to work. It was only in that July 18, 2002 meeting that my eyes were opened and I saw they had it in for me.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 20, 2004.

*/s/ Milton K. Kaopua*
Milton Kaopua

H:\CLIENTS\Kaopua\Plead\08-20-04 Declaration of Milton Kaopua - for OFO Appeal Brief.wpd



*Station 19 A Captain*

# FEDERAL FIRE DEPARTMENT
Naval Station (Attn: N51)
850 Ticonderoga, Suite 105
Pearl Harbor, HI 96860-5102

```
                                             12000
                                             N51
                                             11FEB02
```

MEMORANDUM

From: Deputy Fire Chief
To:   All Supervisors

Subj: BULLETIN BOARDS

Ref:  (a) COMNAVREGINST 12000.1D

Encl: (1)  HRO Bulletin Board Web Page
      (2)  Civilian Employee Assistance Program
      (3)  Code of Ethics
      (4)  Disciplinary Action Policy - Schedule of Offenses/
           Remedies
      (5)  Equal Opportunity is the Law
      (6)  EEO Points of Contact
      (7)  EEO Complaint Process
      (8)  Family and Medical Leave Act
      (9)  Prohibited Personnel Practices
      (10) Reprisal for Whistleblowing
      (11) Safety and Occupational Health Policy
      (12) Sexual Harassment Policy
      (13) COMNAVREGINST 12000.1D

1. Effective immediately enclosures (1) through (12) will be posted on the bulletin board marked "OFFICIAL". Reference (a) clearly defines the use of "official and "unofficial" bulletin boards. Unofficial information as noted in reference (a) will be posted on a separate bulletin board marked "UNOFFICIAL". Both boards will be located at each station/office area.

2. You will be responsible to assign coordinators to maintain each bulletin board. He/she will be responsible to insure that only appropriate material is posted on bulletin boards in a neat and orderly manner and replace or remove outdated material

3. Enclosure (13) is provided for your information and future reference.

                                    B. K. NAKASONE

Kaopua   Attachment #1

# EQUAL EMPLOYMENT OPPORTUNITY PROGRAM



The Equal Employment Opportunity (EEO) laws and regulations of today are based on principles set forth in the Constitution and the Bill of Rights. Individuals are entitled to an equal chance to enjoy benefits of democracy and the protection of its laws. It is incumbent upon all personnel to support the EEO Program and to strive to eliminate any discriminatory policies and practices. Everyone has the inherent right to fair treatment, equal employment opportunities and a workplace free of harassment (sexual and non-sexual) and discrimination.

**WHO MAY FILE A COMPLAINT:** Any employee, former employee or applicant for employment who feels he/she has been discriminated against because of race, color, religion, sex, national origin, age (40 years and over), physical or mental handicap, sexual orientation or reprisal for prior EEO involvement or because of any opposition to an unlawful employment practice under 29 CFR 1614, including Equal Pay Act complaints, may file a discrimination complaint. Discrimination complaints based on age will be processed if complainants are at least 40 years of age or older at the time the discriminatory act was alleged to have occurred. In lieu of the above method of complaints processing for age complaints, the complainant may serve the EEOC with notice of intent to file a civil action and after 30 days proceed directly into Federal Court. Sexual harassment complaints against an uniformed service member can also be addressed under the Section 1561, of Title 10, U.S. Code. Employees claiming discrimination based on sexual orientation may seek redress from the Merit Systems Protection Board; the Office of Special Counsel; the Negotiated Grievance Procedure, if applicable; or the Administrative Grievance Procedure. Additional information is available by calling the EEO Complaints Division at 473-8800, ext. 5724/5727.

**WHERE TO FILE A COMPLAINT:**

*Mailing Address*
COMMANDER NAVY REGION HAWAII
HUMAN RESOURCES OFFICE (N01 (c/o EEO)
850 TICONDEROGA STREET SUITE 110
PEARL HARBOR HI 96860-5101

Phone: 473-8000 ext 5724/5727
TDD:  474-2145
FAX:  471-0665

*Physical Location*
Russell Avenue, Building 1, 2nd floor, Pearl Harbor HI

**HOW TO FILE A COMPLAINT.** Individual and Class Action complaints must first be presented to an EEO Counselor within 45 calendar days from the date of the matter alleged to be discriminatory, or in the case of a personnel action, within 45 calendar days of its effective date. Individuals may choose between participation in an alternative dispute resolution (ADR) process or traditional counseling. If both parties agree to ADR, arrangements will be made to mediate the dispute. If traditional counseling is elected, an EEO Counselor will be assigned and will attempt to resolve the complaint during the pre-complaint process.

---

[Flowchart of EEO complaint process:]

- EEO COUNSELOR CONDUCTS FACTFINDING AND ATTEMPTS RESOLUTION WITHIN 30 DAYS
- INDIVIDUAL HAS 45 DAYS FROM INCIDENT TO CONTACT EEO OFFICE
- INDIVIDUAL ELECTS TRADITIONAL COUNSELING OR ALTERNATIVE DISPUTE RESOLUTION (ADR) PROCESS
- ADR EXTENDS PRE-COMPLAINT PROCESS UP TO 90 DAYS TO ATTEMPT RESOLUTION
- IF NOT RESOLVED, NOTICE OF RIGHT TO FILE IS ISSUED AND INDIVIDUAL HAS 15 DAYS TO FILE A FORMAL COMPLAINT
- FORMAL COMPLAINT FILED
- ACCEPTED CLAIMS INVESTIGATED WITHIN 180 DAYS
- INDIVIDUAL MAY REQUEST AN EEOC HEARING AND DECISION OR REQUEST A FINAL SECNAV DECISION WITHIN 30 DAYS FROM RECEIPT OF REPORT OF INVESTIGATION
- INDIVIDUAL CAN FILE CIVIL ACTION 180 DAYS AFTER FILING FORMAL COMPLAINT IF NO FINAL ACTION HAS NOT BEEN TAKEN
- EEOC ADMINISTRATIVE JUDGE (AJ) CONDUCTS HEARING & ISSUES DECISION WITHIN 180 DAYS
- IF NO HEARING, SECNAV ISSUES FINAL AGENCY DECISION WITHIN 60 DAYS
- INDIVIDUAL MAY APPEAL AGENCY FINAL DECISION TO EEOC WITHIN 30 DAYS OR FILE CIVIL ACTION WITHIN 90 DAYS
- SECNAV ISSUES FINAL ORDER AND AGENCY DEPT IMPLEMENTS WITHIN 40 DAYS OR APPEALS AJ'S DECISION TO EEOC
- AGENCY IMPLEMENTS AJ'S DECISION
- AGENCY APPEALS AJ'S DECISION TO EEOC WITHIN 40 DAYS
- EEOC OFFICE OF FEDERAL OPERATIONS ISSUES DECISION ON APPEALED ISSUES
- INDIVIDUAL MAY APPEAL AJ'S DECISION AND AGENCY FINAL ORDER WITHIN 30 DAYS OR FILE CIVIL ACTION WITHIN 90 DAYS
- INDIVIDUAL MAY FILE CIVIL ACTION WITHIN 90 DAYS
- INDIVIDUAL'S COMPLAINT FORWARDED TO FEDERAL COURT

*Mediation may be used to reach resolution/settlement at any stage during the process. All days are calendar days.

ENCLOSURE (7)

page 2 of

## DECLARATION OF PETITIONER(S)

Petitioner states the following is true:

- ☑ Recent or past act(s) of harassment occurred; and/or
- ☑ Threats of harassment make it probable that acts of harassment may occur soon.

Respondent(s) ☐ own; ☐ possess; or ☑ intend to obtain or possess
☑ firearm(s) and/or ammunition that may be used to threaten or injure Petitioner(s).

Describe the firearm(s)/ammunition: _Based on his verbal threat to shoot me, I_
Location of firearm(s)/ammunition: _believe he has a gun._
Date last seen: _____
Street address/ specific location where last seen: _____

(Explain in detail recent or past acts or threats of harassment, using additional sheets, if necessary.)

On 10-13-01 Security Police Officer Colin Hallberg informed me that Capt. Robert Abad made a verbal threat on my life. At that time I was not told what kind of threat it was. He also informed me the threat was made on 10-10-01 at about 1645 hrs.

On 10-23-01 at 1530 hrs. I walked up to the Federal Police Station and spoke with Officer Hallberg. I asked him what kind of threat it was. Officer Hallberg informed me that Capt. Abad made a verbal threat that he was going to shoot Kaopua because that is what its coming to. At this point I am afraid for my life and I don't know what he is capable of doing. I also filed a police Report - Report No. 01-416154 and Federal Incident Report - Incident No. 0162 81 303 509

☑ Unless Respondent(s)' wrongful conduct is stopped or prevented by order of the Court, Petitioner(s) will suffer emotional distress.

I have read the Petition and Declaration, know their contents, and verify that the statements contained therein are true to my personal knowledge and belief.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF HAWAI'I THAT THE FACTS AND CIRCUMSTANCES STATED IN THE PETITION AND DECLARATION ARE TRUE AND CORRECT.

Date: 10-26-01

Signature of Petitioner(s): _Milton K. Kaopua_
Print/Type Name(s): _Milton K. Kaopua_

Kaopua   Attachment #2