IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MILTON K. KAOPUA, | ) CIVIL NO. CV04 00723 JMS / KSC |
| | ) |
| Plaintiff, | ) DECLARATION OF |
| vs. | ) ELBRIDGE W. SMITH; |
| FEDERAL FIRE DEPARTMENT; | ) EXHIBITS "H" - "R" |
| DONALD C. WINTER, Secretary, | ) |
| Department of the Navy, | ) |
| | ) |
| Defendants. | ) |

H:\CLIENTS\Kaopua\Plead - USDC\Decl EWS opp SJ.wpd

## **DECLARATION OF ELBRIDGE W. SMITH**

I, Elbridge W. Smith, do hereby declare as follows:

    1.    I am the principal attorney of the firm SMITH HIMMELMANN, Designated Representative of Plaintiff Milton K. Kaopua in the foregoing matter.

    2.    I make this Declaration of my own personal knowledge in support of Plaintiff's Opposition Memorandum to Defendants' Motion for Dismissal or in the alternative, for Summary Judgment Filed March 26, 2006, and am competent to testify to the facts stated herein.

    3.    On December 21, 2001 our firm was retained by Plaintiff for the primary purpose of representing him concerning his Office of Workers' Compensation Programs (hereinafter "OWCP") claim for a workplace injury flowing from a death threat by a co-worker, Federal Fire Captain Robert F. Abad.

    4.    At the time I was retained to represent Plaintiff, he informed me of the basis for his OWCP claim and expressed concern that management did not take seriously the threat against his life by a co-worker, was not processing his workers compensation claim so that he and his doctor could be paid, was taking no corrective action involving the workplace, and he feared for his safety and life. He was very distraught.

5. Plaintiff expressed dissatisfaction that his then TRO and workers compensation attorney did not know Federal employment or workers compensation law. Mr. Kaopua stated that although he had been off work since the end of September 2001, he had been unable to secure OWCP payments and was running out of sick leave and money to cover his expenses.

6. I asked Plaintiff if he had been approved for advanced sick leave or the leave transfer program, but he said neither his other lawyer nor his supervisors had mentioned those options to him and he was not familiar with them.

7. As a result of the threat to his life, Plaintiff explained, he and his other lawyer felt that he had no alternative but to seek a State Court Temporary Restraining Order (hereinafter "TRO"), against his antagonist, Fire Captain Robert F. Abad, which was then pending. It was agreed that I would take over representation relating to his OWCP and employment issues while his other attorney completed the TRO proceedings.

8. Attached hereto as Plaintiff's Exhibit "H" is a true and correct copy of the Order Granting Petition for Injunction Against Harassment entered by the Honorable David L. Fong, dated December 31, 2001 in Kaopua v. Abad, Civil No. 1ss01-01394 in the District Court of the First Circuit, State of Hawaii.

9. Consequently, I made several contacts to the Navy Human Resource Office to try and trace the OWCP claims, and to find out why Mr. Kaopua was not getting advanced sick leave or transfer leave program benefits. The Agency represented that it had apparently "lost" Mr. Kaopua's OWCP claim and that he had not applied for other benefits. (*See* Def. Exh. "10":" weren't sure what happened to it". Patti K. Devita, Human Resource Specialist, Pearl Harbor).

10. We helped Mr. Kaopua resubmit a new OWCP claim and to prepare and submit his OPM Leave Transfer Program application in late January 2002.

11. As of the end of January 2002, Plaintiff informed me that he still had not received any OWCP payments. In an effort to provide some financial relief to Plaintiff, I wrote to Agency Labor Advisor Hazel Wong, on February 2, 2002, requesting that Mr. Kaopua be granted 30 days advanced sick leave, retroactive to his last day of paid leave.

12. Attached hereto as Plaintiff's Exhibit "I" is the letter from Declarant to Agency Labor Advisor Hazel Wong, Labor Advisor dated February 2, 2002.

13. On February 2, 2002, Appellant informed me that he received a letter from the Agency stating that his application for the Voluntary Leave Program had been approved, but no one was donating to him.

14. On February 12, 2002, I spoke by telephone with Agency Labor Advisor Hazel Wong concerning the status of Plaintiff's advance sick leave request and his application for the Voluntary Leave transfer program. I followed up this conversation with a written confirmation to Ms. Wong.

15. Attached hereto as Plaintiff's "J" is a true and correct copy of a written confirmation from Declarant to Agency Labor Advisor Hazel Wong dated February 12, 2002, which is part of the Agency's investigative report in this matter.

16. Plaintiff then determined that the Fire Department and Navy had failed to "publicize" his acceptance in the program and need for leave but by not having the notice "posted" at all work locations and by usual e-mail. When I called Agency Labor Advisor Hazel Wong on this deficiency, she denied it. Days later the Agency admitted its deficiency to Ms. Wong and took some corrective action, so that eventually he received a few days of leave transfer credit.

17. On April 18, 2002 I had a telephone conversation with Labor Advisor Hazel Wong concerning what, if any, action the Agency had taken with respect to Captain Abad as a result of his death threat against Mr. Kaopua. Ms. Wong flatly refused to provide me with any specifics, stating only that "management was taking action."

18. Ms. Wong also stated that neither Mr. Kaopua or his physicians would be provided any information about what action management was taking. This conversation was memorialized in a letter to Ms. Wong, dated April 24, 2002. In that letter, I also advised Ms. Wong:

> Mr. Kaopua remains partially dysfunctional and totally unable to work as a result of the threat against him, the apparent reprisals, including transfer of him away from his work station and men (when it would seem that only the perpetrator needed to be moved), the failure of the Agency to take prompt, public corrective action or at least its failure to advise Mr. Kaopua, his representative and physicians of its remedial

3

> actions, and of the failure of the Agency to demonstrate any immediate efforts at meaningful reasonable accommodation, other than to facilitate minimal advanced sick leave and a barely mediocre response to his request for the leave transfer program.
>
> From our meetings and discussions with Mr. Kaopua's treating and evaluating physicians, it is apparent to us that a combination of appropriate therapeutic intervention, including work place accommodation would both speed his recovery and his return to work. Is the Agency interested in such?

Our intent here was to galvanize the Agency out of inaction and into positive action to benefit the employee and bring him back to work. At this time we still could not determine a motive for these inappropriate Agency actions.

19. Attached hereto as Plaintiff's Exhibit "K" is a true and correct copy of Declarant's letter to Agency Labor Advisor Hazel Wong, dated April 24, 2002, which is part of the Agency's investigative report in this matter.

20. By July of 2002, when we and Plaintiff and the doctors still had no responses, it was becoming apparent to me and the Plaintiff that the Agency was simply refusing to cooperate in providing him with a safe and secure working environment. The pattern just kept developing. The question was why? In Plaintiff's conversations with me, he expressed consternation at the Agency's actions towards him and bafflement at the Agency's failure to take actions that it was supposed take as a matter of course.

21. I scheduled a full office meeting on July 18, 2002 with Plaintiff, his wife, my paralegal, and the OWCP nurse assigned to Appellant's case, Jamie Neill, R.N. at which time all perspectives were reviewed. In discussing his on going medical impairments, which has not reached 10 months, it appeared that his condition was not going to be transitory. This was confirmed by telephone consultation with his psychologist Dr. Dave and his psychiatrist, Dr. Shepard Ginandes. I then suggested to Plaintiff, and his wife, that he could be a victim of unlawful employment discrimination because of his continuing injury and absence from work on OWCP compensation -- in violation of the Rehabilitation Act, or on the basis of ethnicity, which are both EEO. Plaintiff told me that he had no knowledge of the EEO process or how to proceed with such a claim.

22.   We then first discussed the entire EEO process and I gave him some materials which explain it. I called Labor Advisor Hazel Wong and left a message requesting EEO contact information. Subsequently she returned my call and left a message advising me of the EEO Contact information. I confirmed this message in a fax to Ms. Wong dated July 18, 2002. That letter also states:

> Your message also noted that the last doctor's note you have from Dr. Ginandes says that Kaopua is off work until September 1. Therefore, you don't understand the failure to accommodate allegation and ask what accommodation does he want? My copy of Dr. Ginandes last note says he will be off until "at least 9-1-02." Dr. Ginandes has repeatedly and consistently said, as has Dr. Davé, and has OWPC nurse Neill, that until Mr. Kaopua has been assured that his work environment is safe he cannot successfully return to work, which should then be to his usual duty station in Lualualei. Thus his impairment and disability continue by both the action and inaction of the Fire Department rather than resolve.
>
> Both doctors and the OWCP [nurse] have asked me what corrective and accommodating actions the Department is taking or at least offering given the accepted facts of his injury and his diagnosis (e.g., what appropriate resolution to the ongoing threat of violence, what corrective action for a death threat by a co-worker in possession of an illegal firearm, what corrective action for the whistleblower disclosures and perceived retaliations?) and the agency gives no reply to me to give to them, nor does it give any directly to Mr. Kaopua, the doctors, or OWCP.

23.   Attached hereto as Plaintiff's Exhibit "L" is a true and correct copy of the facsimile from me to Labor Advisor Hazel Wong, dated July 18, 2002, which is part of the Agency's investigative report in this matter.

24.   Also on July 23, 2002, I spoke by telephone with Randall Johnson, a Navy attorney with the COMNAVREG JAG who told me the Agency considers the matter a "personal one," not an employment issue. Numerous faxes and letters followed in an effort to satisfy the Agency JAG that Mr. Kaopua's work place injury made it an employment matter. It was at this point that I recommended to Plaintiff that he should initiate a complaint of employment discrimination since the Agency would informally resolve these matters. It was now apparent to all that the Agency had no legitimate business reason for refusing to either accommodate Plaintiff or take

5

any action against his antagonist, or otherwise to ensure a safe workplace environment.

25. On July 25, 2002 I sent a fax to Raynette Algoso, the Complaints Program Manager, identified by Ms. Wong as having EEO responsibility for the Federal Fire Department to initiate the EEO process. Attached hereto as Exhibit "M" is a true and correct copy of the facsimile transmission from me to Raynette Algoso, Complaints Program Manager, dated July 25, 2002.

26. Subsequently, EEO Counselor David Gill was assigned to this complaint and on August 19, 2002, I sent him a fax which identified additional issues of concern to Mr. Kaopua. A true and correct copy of that facsimile transmission is attached hereto as Plaintiff's Exhibit "M". As of August 27, 2002, Plaintiff still had not been informed of any Agency action against his antagonist or what the Agency would do to ensure his safety in the workplace. Consequently, on August 27, 2002 I sent yet another letter to Labor Advisor Hazel Wong outlining what assurances Plaintiff and his doctors sought in order to return to the workplace.

27. Attached hereto as Plaintiff's Exhibit "N" is a true and correct copy of the letter from me to Labor Advisor Hazel Wong dated August 27, 2002, which is part of the Agency's investigative report in this matter.

28. In closing out the informal EEO process on September 19, 2002, EEO Counselor David Gill did not provide any reasons, justifications, or offers to meet Mr. Kaopua's doctors' documented medical/safety needs.

29. Attached hereto as Plaintiff's Exhibit "O" is a true and correct copy of the medical record of Hermino D. Mercado, M.D., dated 11/23/2001 (a leave of absence slip), which is part of the Agency's investigative report in this matter.

30. Attached hereto as Plaintiff's Exhibit "P" is a true and correct copy of the medical record of Robert Dave, Ph.D., psychologist, dated January 25, 2002, to the Federal Fire Department, which is part of the Agency's investigative report in this matter.

31. Attached hereto as Plaintiff's Exhibit "Q" are true and correct copies of the medical records of Shepard Ginandes, M.D., psychiatrist; the Worker's Compensation Treatment Plan-April 15, 2002-Revised Report and medical communication of August 29, 2002 (re: status of Milton Kaopua's disability), which are part of the Agency's investigative report in this matter.

32.  Attached hereto as Plaintiff's Exhibit "R" is a true and correct copy of the Plaintiff's Motion to Extend Order Granting Petition for Injunction Against Harassment filed November 21, 2003 in <u>Kaopua v. Abad</u>, Civil No. 1SS01-1394, in the District Court of the First Circuit, State of Hawaii, with attachments.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: Honolulu, Hawaii, June 30, 2006.

_____
Elbridge W. Smith