IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MILTON K. KAOPUA, | ) CIVIL NO. 04-00723 JMS/KSC |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) ORDER GRANTING |
| | ) DEFENDANTS' MOTION TO |
| FEDERAL FIRE DEPARTMENT; | ) DISMISS, OR IN THE |
| GORDON R. ENGLAND, Acting | ) ALTERNATIVE, FOR SUMMARY |
| Secretary, Department of the Navy, | ) JUDGMENT |
| | ) |
| Defendants. | ) |
| _____ | ) |

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS, OR IN THE
ALTERNATIVE, FOR SUMMARY JUDGMENT

　　　　Plaintiff Milton Kaopua has brought several claims against the Federal

Fire Department ("FFD") and Gordon England, Acting Secretary of the

Department of the Navy (collectively, "Defendants"). First, he alleges that,

beginning in 1998 and continuing through his retirement in April 2004, the

Defendants discriminated against him and subjected him to a hostile work

environment based on his race and/or national origin. Second, he contends that in

October 2001 he became mentally disabled as a result of a threat from a co-worker

and that the Defendants refused to offer him a reasonable accommodation for this

alleged disability.

The Defendants ask the court to dismiss or, in the alternative, enter summary judgment in their favor as to all of Kaopua's claims. The Defendants argue that Kaopua's discrimination and hostile work environment claims are time barred. They also contend that Kaopua was not legally entitled to accommodation because he was not disabled and that, even assuming Kaopua was disabled, the Defendants offered him a reasonable accommodation.

For the reasons discussed herein, the court GRANTS the Defendants' motion for summary judgment. The court concludes that Kaopua's claims based on race discrimination and hostile work environment are time-barred. The court also concludes that the Defendants offered Kaopua a reasonable and timely accommodation even though he was not entitled to one because he was not disabled.

## I. <u>BACKGROUND</u>

This case arises out of a protracted dispute between Kaopua and his co-worker, Robert Abad. Kaopua alleges that he was harassed by Abad and that the Defendants' failure to control Abad's behavior resulted in a hostile work environment for Kaopua. Kaopua contends that he became disabled after receiving a threat from Abad and that the Defendants discriminated against him by delaying and interfering with his attempts to obtain leave for his illness. Kaopua also

2

maintains that the Defendants refused to accommodate his disability for a period of approximately eight months.

## A.  Hostile Work Environment

At all relevant times, both Kaopua and Abad were employed as Fire Captains by the FFD.  Initially, the two men were assigned to different shifts at the same station, Fire Station 11.  Kaopua contends that, beginning in 1998, he complained to his supervisors that Abad was using government property and time to raise pigs, fish, and escargot.  Kaopua contends that the FFD never adequately addressed his complaints about Abad and that Abad made a number of false claims against Kaopua.

On October 10, 2001, Abad filed a complaint against Kaopua that eventually lead to this lawsuit.  Abad complained that Kaopua broke a lock that Abad had placed on an ice machine at the fire station.  The police officer who investigated the claim informed Abad that the ice machine was government property and that Abad had no right to lock it for his personal use.  The officer informed Abad that he could pursue a claim for the destruction of the lock, though Abad eventually withdrew the complaint against Kaopua.  During the interview, however, Abad informed the officer that he was tired of Kaopua and stated "I guess I'll just have to shoot him."  Defendants' Ex. 2 at 209.  The officer told Abad

that it was not smart to make such a comment to a police officer and Abad

responded by saying "that's what it is coming to." *Id.* The officer informed

Kaopua of Abad's threat three days later on October 13, 2001.[1] Kaopua reported

the threats to his and Abad's supervisor, Assistant Chief Glen DeLaura, on October

17, 2001. *Id.*

The Naval Criminal Investigative Services investigated Abad's threat

against Kaopua and on July 15, 2002, the United States Attorney for the District of

Hawaii filed an information charging Abad with terroristic threatening. Kaopua

alleges that DeLaura testified for Abad at his criminal trail for terroristic

threatening. Though Abad was eventually found not guilty of the charge, a

supervisor issued him a letter of reprimand on November 27, 2002 for

"Inappropriate Language" related to the incident. Defendants' Ex. 18.

Kaopua also obtained a temporary restraining order against Abad from

the District Court of the First Circuit, State of Hawaii, in October 2001 and

subsequently obtained a Order Granting Petition for Injunction Against

Harassment ("Injunction") on December 13, 2001. Kaopua alleges that Abad

violated the Injunction on two occasions. First, in August of 2002, while Kaopua

---

[1]Kaopua contends that he learned "generally" about Abad's statements on October 13 but that he did not learn that Abad had threatened to shoot him until October 23, thirteen days after the threat.

was on medical leave, Abad approached Kaopua at a Waianae supermarket parking lot.  Abad was convicted in state court of violating the Injunction on March 28, 2003 and was given probation.  Abad again approached Kaopua in violation of the Injunction on May 29, 2003.  On this occasion, Abad approached Kaopua at his work station.  Abad received a three-day suspension from DeLaura, his supervisor, for violating DeLaura's order to stay away from Abad.  Defendants' Ex.  20.

In addition to his allegations regarding Abad's behavior, Kaopua contends that he has encountered hostility from other co-workers at FFD.  He alleges that on several occasions he has encountered unexplained hostile outbursts from both subordinates and superiors.  On one occasion, he maintains that he was sent to a mandatory training without the proper orders and as a result was forced to spend the day observing while others were trained.  He contends that this hostile work environment persisted until his mandatory retirement on April 24, 2004.

**B.  Discrimination**

Kaopua contends that the Defendants discriminated against him by mishandling his various requests for leave.  First, he alleges that the Defendants intentionally delayed his attempt to obtain benefits from the Department of Labor, Office of Workers' Compensation Programs ("OWCP").  When Kaopua initially took medical leave in October 2001, he requested that DeLaura place him on

Traumatic Injury leave. DeLaura denied this request and instructed him to use his sick leave instead. Kaopua then filed a "Traumatic Injury and Claim for Continuation of Pay/Compensation (CA-1)" on November 16, 2001, reflecting his date of injury as October 13, 2001. The Defendants opposed this claim because it was not submitted within 30 days of the date of the injury. The Defendants did not send the completed forms regarding Kaopua's request to the OWCP until March 2002. Defendants Ex. 9 at 21. Kaopua attributes this delay to racial discrimination, whereas the Defendants maintain that the delay was simply a product of bureaucratic inefficiency. In April 2002, the Department of Labor informed Kaopua that his claim was for an occupational injury rather than a traumatic injury and that he should submit the appropriate paperwork for the correct claim. Kaopua submitted the correct claim form and his claim was accepted.

Second, Kaopua contends that the Defendants delayed and interfered with his attempt to obtain leave donations through the Voluntary Leave Transfer Program. Kaopua submitted an application to become a leave recipient under the Voluntary Leave Transfer Program on January 25, 2002, and his application was approved on February 15, 2002. Notice that Kaopua was seeking leave donations was sent to fire stations on February 19, but the announcement that he was seeking

donations of leave was not immediately posted at the fire stations. Kaopua's attorney contacted the FFD on March 8, 2002 to inform the Defendants that the announcement had not been posted. Another notice was then sent out and an announcement that Kaopua was seeking donations of leave was finally posted on March 11, 2002. Defendants' Ex. 15. Kaopua received some donations of leave but complained that one donation offer was erroneously rejected. Kaopua acknowledges, however, that when his attorney informed Navy officials of this allegedly wrongful rejection, the leave donation was approved.

## C. Accommodation

On October 27, 2001, shortly after learning about the threat from Abad, Kaopua went on medical leave and was subsequently diagnosed with "Adjustment Disorder with Mixed Anxiety and Depression." Defendants' Ex. 5. He remained on leave for over a year until November 22, 2002. Kaopua maintains that his condition constituted a disability and that the Defendants refused to accommodate his disability by providing him with a safe workplace in a timely fashion. A "safe workplace," he contends, could have been achieved if the Defendants disciplined Abad, moved him away from Fire Station 11, allowed Kaopua to remain at Fire Station 11, and made "a public expression of support and concern for [Kaopua's] safety." Complaint at 8.

7

Kaopua alleges that he informed management officials at FFD about his mental condition in November 2001 and that he requested that they accommodate him by providing him with a safe workplace.   It is not clear exactly what accommodation he requested at this point because and there is no evidence of this request in the record.  The only evidence that Kaopua requested accommodation in 2001 is found in an affidavit from Kaopua taken during an investigation of his discrimination claim before the Equal Employment Opportunity Commission ("EEOC").  In the affidavit, Kaopua states that he informed the Defendants of his disability and requested accommodation on October 25, 2001.  Plaintiff's Ex. A at 62.

On November 13, 2001, the Defendants transferred both Kaopua and Abad, effective December 2, 2001, to different fire stations.  Both men were moved approximately 20 miles from Fire Station 11 to fire stations where they would not respond to the same emergencies and would not otherwise come into contact with each other.  Defendants' Ex. 8, Ex. 27 at 276.  Additionally, Kaopua was placed at a station where other supervisors were on duty and could help him if any problems arose.  *Id.*

In a letter dated January 25, 2002, Kaopua's psychologist informed the FFD that Kaopua was unable to work and stated that "[w]ith continued

progress and, importantly, an appropriate resolution to the ongoing threat of violence originating in Captain Kaopua's work environment, a feasible prognosis is that he may be able to return to work in the next two to six months." Plaintiff's Ex. P. Kaopua contends that this letter constituted a request for accommodation and that the defendants did not promptly respond to this request.

Several months later, Kaopua's attorney began sending letters to the FFD raising the issue of accommodation. The first letter, dated April 24, 2002, stated that "it is apparent . . . appropriate therapeutic intervention, including work place accommodation would both speed [Kaopua's] recovery and his return to work." Plaintiff's Ex. K. The letter also indicated that Kaopua was unhappy with his transfer to a different fire station. *Id.* The FFD responded to this letter on May 3, 2002 and asked Kaopua's attorney what sort of accommodation Kaopua was seeking. Defendants' Ex. 23 at 244. There is no evidence that Kaopua responded to the Defendants' request.

Kaopua's attorney then sent letter on July 18, 2002 stating that Kaopua could not return to work until he was assured a safe work environment and that Kaopua should be allowed to return to his usual station, Fire Station 11. Plaintiff's Ex. L. The FFD responded to this letter on July 26, 2002 and stated that, while it was unaware until the July 18 letter that Kaopua was seeking

9

accommodation, it had already ensured Kaopua's safety by removing Abad from
Fire Station 11.  Defendants' Ex. 23 at 246.  Moreover, the FFD stated that Kaopua
could return to Fire Station 11 where he was previously assigned.  *Id.*

Kaopua's attorney sent a third letter on August 27, 2002 requesting
further assurance and details regarding how the FFD planed to ensure Kaopua's
safety.  Plaintiff's Ex. M.  The FFD responded in a letter dated September 16, 2002
in which it reiterated in greater detail that Abad had been assigned to a different
station than Kaopua, that Kaopua and Abad should not have cause to come into
contact with one another, and that Kaopua could return to Fire Station 11 as he
requested.  Defendants' Ex. 27.

Kaopua acknowledges that as of the September 16 letter, the
Defendants offered Kaopua a reasonable accommodation.  He contends, however,
the he is entitled to damages because it took the Defendants nearly eight months
from his doctor's January 25, 2002 letter to accommodate his alleged disability.

**D.  Procedural Background**

Kaopua first contacted a counselor at the EEOC on July 25, 2002.  He
then filed a formal complaint on October 3, 2002.  On February 26, 2004, an
Administrative Judge ("AJ") at the EEOC issued a decision in which she
concluded that Kaopua's hostile work environment and discrimination claims were

10

untimely. She also found that Kaopua's reasonable accommodation claim was factually unsupported and that the Defendants provided Kaopua with a reasonable accommodation. Defendants' Ex. 31. The AJ's ruling was accepted by the Navy in a Final Order dated April 15, 2004. Kaopua appealed this final order to the EEOC which sustained the AJ's finding on September 10, 2004. Kaopua subsequently filed the instant action in federal court. The court heard argument from the parties on August 1, 2006. Both parties filed supplemental briefs on August 8, 2006.

## II. LEGAL STANDARD

Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law. *Hal Roach Studios v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989). When "matters outside the pleadings are presented to and not excluded by the court," as has occurred in the instant case, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . ." Fed. R. Civ. P. 12(c).

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses[.]"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986).  The burden initially lies with the moving party to show that there is no genuine issue of material fact.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987).  Nevertheless, "summary judgment is mandated if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'"  *Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999) (quoting *Celotex*, 477 U.S. at 322).

## III.  ANALYSIS

### A.  Title VII Claims

Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972 ("Title VII"), prohibits discrimination in federal employment based on race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-16.  Title VII is violated when an employee is discriminated against because of his or her membership in a protected class or when an employee

12

is required to work in a discriminatorily hostile environment.  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 768 (1998).

Kaopua asserts two claims based on Title VII.  First, he alleges that he was subjected to a hostile work environment as a result of the Defendants' implicit endorsement of Abad's conduct.  Second, he contends that the Defendants acted with a discriminatory motive in delaying and/or interfering with his attempts to obtain leave.  The court concludes that both of theses claims are time-barred because Kaopua failed to present these allegations to an EEOC counselor within the statutory deadline.

In order for a discrimination complaint to be timely filed, a federal employee must bring the matter to the attention of an EEOC counselor within 45 days of the alleged discriminatory event.  29 C.F.R. § 1614.105(a)(1) ("An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.").  The Defendants argue that both of Kaopua's discrimination claims are untimely because Kaopua waited more than 45 days after the latest alleged discriminatory event to contact the EEOC.  Kaopua contends that his discrimination claims are timely and offers four arguments in support of his position.  First, he argues that the Defendants waived the forty-five

13

day filing period by failing to raise the alleged untimeliness of Kaopua's complaint before the EEOC.   Second, he contends that the acts of discrimination alleged in the Complaint constitute a continuing violation and that he timely complained of this continuing violation to the EEOC in a timely fashion.   Third, Kaopua contends that he did not learn that incidents alleged in his complaint constituted unlawful discrimination and harassment until July 2002, shortly before he contacted an EEOC counselor.   Finally, Kaopua contends that the filing deadline should be equitably tolled because he was not aware of the requirement that he contact an EEOC counselor within forty-five days of a discriminatory event.

The court concludes that Kaopua's claims of discrimination are untimely.  The Defendants did not waive forty-five day deadline, Kaopua has not alleged that any discriminatory events occurred within the 45-day statutory period, Kaopua knew or should have known the basis for his discrimination claims prior to July 2002, and Kaopua has failed to demonstrate that the statutory deadline should be equitably tolled.

1.  The Defendants did not waive the 45-day deadline

Kaopua contends that the Defendants waived their right to argue that Kaopua failed to contact an EEOC counselor within the 45-day deadline because

the Defendants did not raise the issue of timeliness before the EEOC.  The court disagrees.

A federal agency does not waive its objection to the untimeliness of a discrimination complaint simply by receiving and investigating the complaint; as long as the investigation does not result in a finding of discrimination, the agency may raise the untimeliness of the complaint as a bar to subsequent litigation.  *Boyd v. United States Postal Service*, 752 F.2d 410 (9th Cir. 1984) ("The mere receipt and investigation of a complaint does not waive objection to a complainant's failure to comply with the original filing time limit when the later investigation does not result in an administrative finding of discrimination.")  In the instant case, the Department of the Navy accepted Kaopua's complaint and the Department of Defense, Office of Complaint Investigations, investigated it.  Defendants' Ex. 32. This investigation did not result in a finding of discrimination.  *Id.*  Rather, the AJ issued a decision in which she concluded that Kaopua's complaint was untimely, and that, even if Kaopua had contacted the EEOC within the 45-day deadline, Kaopua presented no evidence from which a reasonable finder of fact could conclude that the Defendants discriminated against him or subjected him to a hostile work environment.  Defendants' Ex. 31 at 7-12.  Because the Defendants' investigation did not lead to an agency finding of discrimination, the Defendants

15

have not waived their right to raise the timeliness of Kaopua's contact with the

EEOC.

    2.  <u>None of the alleged discriminatory conduct occurred within 45 days of Kaopua's complaint to the EEOC</u>

        Kaopua also argues that the Defendants' alleged discriminatory

conduct constituted a "continuing violation" that began in 1998 and continued

through October 2002.  Notwithstanding this general allegation, Kaopua has

specified no acts of discrimination that occurred within 45 days of his first contact

with the EEOC.  Regardless of whether the Defendants' alleged conduct is viewed

as a series of isolated incidents or as an ongoing pattern of conduct, at least some

alleged discriminatory event must have occurred within 45 days of Kaopua's first

contact with the EEOC in order for Kaopua's complaint to be timely.  *Lyons v.*

*England*, 307 F.3d 1092, 1105-1106 n.6 (9th Cir. 2002).  *See also National R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).  The record contains no

evidence of any alleged discriminatory conduct within 45 days of July 25, 2002,

when Kaopua first contacted an EEOC counselor.

    **a.  Hostile work environment**

        Kaopua contends that he was subjected to a hostile work environment

from sometime in 1998 until his retirement in April 2004.  He reiterates the same

16

allegations that he brought before the EEOC for the time period of 1998 through

October 2002; all of these allegations relate to the ongoing hostilities between

Kaopua and Abad, culminating in the October 2001 threat that precipitated

Kaopua's leave of absence.  As discussed by the AJ, however, Kaopua could not

have encountered a hostile work environment while he was not at work.

Kaopua was absent from work on medical leave from October 27,

2001 until November 22, 2002.  He  has offered no explanation for how he

suffered a hostile work environment from October 27, 2001 through October 2002

while he was not working.  Rather, he contends that the alleged hostility from

Abad constituted a continuous violation and that the court can look to events that

occurred outside the statutory period in order to determine liability.  While Kaopua

is correct that the court may consider events occurring outside the statutory filing

period in deciding a hostile work environment claim, at least some discriminatory

conduct must occur within the filing period in order for the claim to be timely.

*Lyons*, 307 F.3d at 1105-1106 n.6 (applying the *Morgan* rule to 29 C.F.R.

§ 1614.105(a)(1)).  *See Morgan*, 536 U.S. at 117 ("It does not matter . . . that some

of the component acts of the hostile work environment fall outside the statutory

time period [specified in 42 U.S.C. § 2000e-5(e)].  *Provided that an act*

*contributing to the claim occurs within the filing period*, the entire time period of

17

the hostile environment may be considered by a court for the purposes of

determining liability." (Emphasis added)).  Because Kaopua has not alleged

incidents related to his hostile work environment claim that occurred within 45

days of July 25, 2002, when he first contacted the EEOC, the court concludes that

Kaopua's hostile work environment claim based on his allegations that Abad

harassed and threatened him from 1998 through October 2002 is time-barred.

        In his Complaint, Kaopua alleges that Abad approached him on two

occasions after Kaopua took a leave of absence from work.  There is no evidence

in the record that Kaopua ever raised these allegations with the EEOC.  In order for

Kaopua bring a hostile work environment claim in federal court, he must first

exhaust his remedies before the EEOC.  Though an EEOC charge need not

articulate every applicable legal theory or allege every detail ultimately relied on in

a subsequent lawsuit, the charge must be clear enough to notify the agency of the

operative facts of the case.  *Ong v. Cleland*, 642 F.2d 316, 318 (9th Cir. 1981)

(EEOC charge must be clear enough to notify the agency of the legal theory being

argued and the facts at issue).

        The first instance occurred in August of 2002, when Abad allegedly

approached Kaopua at a supermarket.  The event occurred away from the work

premises at a time when neither Abad nor Kaopua was on duty.  In fact, Kaopua

18

had been on medical leave for ten months when the encounter occurred. Kaopua
has failed to articulate how this event could have contributed to a hostile work
environment or how Abad's conduct could in any way be attributed to his
employer. The court therefore does not consider this allegation as supporting
Kaopua's hostile work environment claim.

       The second event occurred when Abad allegedly approached
Kaopua's work station in March 2003. Though Kaopua's complaint alleges that no
action was taken against Abad as a result of this incident, the Defendants have
provided evidence, which Kaopua does not dispute, indicating that Abad was
suspended for three days as result of his conduct. Moreover, as discussed below,
Kaopua has acknowledged that as of September 16, 2002, the Defendants ensured
him a safe work environment by separating him from Abad and taking appropriate
steps to ensure that Abad stayed away from him. Given this acknowledgment, the
court finds that the March 2003 incident is unrelated to the pattern of harassment
from Abad, alleged in Kaopua's Complaint and before the EEOC, and that the
conduct clearly was not condoned by the Defendants. The court therefore does not
consider this allegation to be part of his hostile work environment claim.

       Kaopua also alleges that FFD personnel other than Abad expressed
hostility toward him. He contends that he has encountered unexplained hostile

19

outbursts from both subordinates and superiors and that, on one occasion, he was sent to a mandatory training without the proper orders. Though it is not clear from the complaint when these other alleged hostilities occurred, Kaopua states generally that the hostile work environment persisted through April 2004. Regardless of when these alleged events occurred, they do not save Kaopua's hostile work environment claim form being time-barred because they cannot serve as the basis for his lawsuit. Kaopua did not raise any alleged hostile work conditions persisting after October 2002 with the EEOC, nor did he allege hostilities other than those related to his ongoing dispute with Abad. Any new factual allegations not raised in his complaint before the EEOC and not related to his allegations concerning Abad cannot serve as a basis for the instant lawsuit. *Ong*, 642 F.2d at 318.

### b. Discrimination with respect to medical leave benefits

Kaopua contends that the defendants discriminated against him by delaying and interfering with his requests for leave. He alleges both that the Defendants delayed in processing his requests for benefits from the OWCP and that the Defendants delayed and interfered with his attempts to obtain donations of leave through the FFD's voluntary leave transfer program. At the August 1, 2006 hearing, however, the court asked Kaopua's counsel several times what acts of

20

discrimination occurred within the 45 days prior to Kaopua's first contact with the

EEOC on July 25, 2002.  Kaopua's counsel conceded that he could point to no

discriminatory events that occurred during that time period.[2]  After reviewing the

record, the court concludes that both of Kaopua's discrimination claims were

untimely.

      Kaopua alleges that the Defendants delayed sending the completed

forms for his request for traumatic injury leave to the OWCP.  It is undisputed that

Kaopua's supervisor sent the completed forms to the OWCP in March 2002.

Kaopua learned that the Defendants had finally submitted his request to the

OWCP, at the latest, in April 2002 when the Department of Labor informed him

that they received his claim and that he should submit a claim for an occupational

---

[2]In his supplemental brief filed August 8, 2006, Kaopua states that incidents of race discrimination did in fact occur within 45 days of his July 25, 2002 contact with an EEOC counselor.  However, Kaopua fails to identify any alleged incident of race discrimination occurring within 45 days of his contact with the EEOC for which there is any support in the record.  First, Kaopua claims that the Defendants' failure to accommodate his alleged disability was ongoing through July 2002.  To the extent Kaopua suggests that this alleged lack of accommodation supports his discrimination claims, the court finds, as discussed more fully *infra*, that the Defendants were more than reasonable in accommodating Kaopua.  Kaopua also contends that the Defendants delayed his attempt to obtain benefits from the OWCP sometime between April 24 and July 26, 2002.  He does not give an exact date for this alleged incident and an exhaustive review of the record reveals no evidence of any such incident occurring within 45 days of his contact with the EEOC.  Finally, Kaopua states that he received a message from United States Attorney Ed Kubo on June 22, 2002 stating that the United States Attorney's Office had no record of Kaopua's complaint about Abad's threat.  Kaopua raises this issue for the first time in his supplemental brief and points to no evidence in the record to support this claim.  Moreover, the record reflects that Abad was in fact prosecuted by the United States Attorney's Office for the threat he made against Kaopua.

injury instead.  From that point forward, Kaopua worked directly with the OWCP

and ultimately obtained the benefits he was seeking.  If Kaopua believed that the

Defendants delayed in submitting his paperwork for discriminatory reasons, he

certainly was aware of the full extent of that delay by April 2002 when he received

notice that from the Department of Labor that his paperwork had been received and

reviewed.  His first contact with an EEOC counselor more than 45 days later on

July 25, 2002 was therefore untimely.

      Kaopua also contends that the Defendants discriminated against him

by delaying and interfering with his attempt to obtain leave donations through the

voluntary leave transfer program.  It is undisputed that Kaopua's application to

participate in the leave transfer program was approved on February 15, 2002 and

that notice that Kaopua was seeking leave donations was sent to fire stations on

February 19.    Kaopua's attorney contacted Navy officials on March 8, 2002 to

inform them that the announcement had not been posted.  Another notice was then

sent out to fire stations and an announcement that Kaopua was seeking donations

of leave was finally posted at on March 11, 2002.  Kaopua then began receiving

leave donations.  Kaopua does not dispute that he was fully aware of the extent of

any delay in posting the announcement that he was seeking leave donations by

March 2002. His claim that any delay in posting is leave transfer announcement was motived by discrimination is therefore untimely.[3]

3. Kaopua was aware or should have been aware of the basis for his discrimination claims as the alleged acts of discrimination occurred

The 45-day period within which an employee must contact an EEOC counselor is tolled when "he or she did not know and reasonably should not have known that the discriminatory matter or personnel action occurred[.]" 29 C.F.R. § 1614.105(a)(2). Kaopua contends that it was not until he sat down with his lawyer in July 2002 and made a checklist of the harassment he allegedly endured from Abad for at least five years and the various delays that occurred in processing his leave requests that he realized that the Defendants were discriminating against him because of his race. Kaopua admits that he had full knowledge of the facts forming

---

[3]Kaopua also contends that on one occasion the Defendants turned away a person who wanted to donate leave to him. It is not clear from the record whether this allegation was ever presented to the EEOC. Nor is it clear when exactly this alleged incident occurred. The Defendants have presented evidence, which Kaopua does not dispute, that one leave donation was received from Kaopua's ex-sister-in-law, Aimee Jensen. Defendants' Ex. 13 at 120. Jensen submitted a form on August 29, 2002, and the leave transfer was approved less than two weeks later on September 11, 2002. *Id.* The official who processed the transfer request avers that any delay was not intentional or motivated by discrimination. *Id.* Assuming that Kaopua's allegation regarding a wrongfully rejected donation request was presented to the EEOC and was timely, Kaopua has come forward with no evidence to rebut the Defendants' evidence that the leave transfer request was processed in a timely and non-discriminatory fashion. In fact, a delay of two weeks does not appear to be unreasonable. Thus, even if this allegation could support a discrimination claim that is not time-barred, Kaopua has failed to meet his burden on summary judgment.

the basis of his discrimination claim as they unfolded.  All that was missing prior to July 2002 was the discussion with his attorney and the list they created together.

Kaopua is not entitled to have the 45-day filing period tolled on these facts.  He has offered no reason why he and his lawyer waited until July 2002, well over 45 days after the latest alleged discriminatory event, to have their revelatory conversation about Kaopua's problems at work.  Pursuant to Kaopua's reasoning, employees can contact the EEOC whenever it happens to occur to them that their employer discriminated against them, regardless of when the alleged incidents of discrimination actually occurred.  Kaopua cites no authority for his theory, which would render the 45-day filing period virtually meaningless.  The court concludes that Kaopua knew of the basis for his discrimination claims as they unfolded and that the 45-day filing period began to run when the events occurred.

The court notes that Kaopua's argument on this point only serves to underscore the substantive weakness of his discrimination case.  Kaopua essentially admits that he has no evidence that any of the incidents he alleged was motivated by discrimination.  Rather, he concluded that the Defendants must be discriminating against him because he and his lawyer could not think of another explanation for the Defendants' conduct.

4. <u>Kaopua is charged with knowledge of the filing deadline</u>

The requirement that federal employees timely file their claims of discrimination with the EEOC is subject to the doctrine of equitable tolling. *Leorna v. United States Dep't of State*, 105 F.3d 548, 551 (9th Cir. 1997). A claimant's failure to comply with the time requirement because he or she was unaware of the filing deadline may be excused under this doctrine. *Id.* "However, once a claimant retains counsel, tolling ceases because she has 'gained the 'means of knowledge' of her rights and can be charged with constructive knowledge of the law's requirements.'" *Id.* (quoting *Stallcop v. Kaiser Found. Hosps.*, 820 F.2d 1044, 1050 (9th Cir. 1987)).[4]

At the August 1, 2006 hearing, counsel for Kaopua acknowledged that Kaopua retained him in December 2001. Moreover, it is clear from the record that Kaopua was represented by counsel throughout 2002, because his attorney wrote numerous letters to the Defendants on his behalf. As of December 2001, Kaopua had the "means of knowledge of [his] rights." *Leorna*, 105 F.3d at 551 (internal quotation signals omitted). Kaopua therefore is not entitled to equitable tolling of the 45-day filing period.

---

[4]It is clear from the record that Kaopua retained counsel by December 2001. Therefore, the court need not decide whether Kaopua would be charged with knowledge of the filing deadline if he had only consulted counsel. *See Leorna*, 105 F.3d at 551 n.2; *Thornhill v. Marsh*, 866 F.2d 1182, 1184-85 (9th Cir. 1989).

25

**B.  Denial of Reasonable Accommodation Claim**

The Rehabilitation Act, 29 U.S.C. § 791 *et seq*., prohibits federal agencies from discriminating against employees with disabilities and incorporates the substantive standards set forth by the Americans with Disabilities Act.  29 U.S.C.A. § 791(g).[5]

"In order to make out a claim under the Rehabilitation Act, [the plaintiff] must establish, *inter alia*, that he is (1) an individual with a disability, (2) otherwise qualified and (3) subjected to discrimination solely by reason of his disability."  *Mustafa v. Clark County School Dist.*, 157 F.3d 1169, 1174 (9th Cir. 1998) (per curiam).  "If the plaintiff makes out a prima facie case . . . , the burden shifts to the defendant who must demonstrate a legitimate nondiscriminatory reason for the [adverse employment action]."  *Lucero v. Hart*, 915 F.2d 1367, 1371 (9th Cir. 1990).  *See also Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003) (applying the burden-shifting framework set forth in *McDonnell Douglas Corp. v.*

---

[5] 29 U.S.C.A. § 791(g) provides:

> The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201-12204 and 12210), as such sections relate to employment.

26

*Green*, 411 U.S. 792 (1973), to a disability discrimination claim brought pursuant to the ADA).

The Defendants contend that Kaopua was not disabled within the meaning of the Rehabilitation Act and that, even assuming that Kaopua was disabled, the Defendants offered him a reasonable accommodation. The court agrees.

      1. <u>Kaopua was not disabled</u>

The Rehabilitation Act defines "disability" as follows:

> The term "disability" means--
>     **(A)** except as otherwise provided in subparagraph (B), a physical or mental impairment that constitutes or results in a substantial impediment to employment; or
>     **(B)** . . . a physical or mental impairment that substantially limits one or more major life activities.

29 U.S.C. § 705 (9).

Kaopua contends that he was limited in the major life activity of working as a result of his "Adjustment Disorder with Mixed Anxiety and Depression." Kaopua contends that this disorder was caused by Abad's treatment of him and that he could not work until he was assured that he would not come into contact with Abad. He does not contend that he could not work at all. Rather, his

position is that, after obtaining treatment, he could return to work but could not

work in an environment that included Abad.  *See* Plaintiff's Ex. A at 61.

The inability to work with a particular person does not constitute a

"disability" within the meaning of the Rehabilitation Act.  *Weiler v. Household*

*Fin. Corp.*, 101 F.3d 519, 524-25 (7th Cir. 1996) ("The major life activity of

working is not 'substantially limited' if a plaintiff merely cannot work under a

certain supervisor because of anxiety and stress[.]"); *Siemon v. AT & T Corp.*, 117

F.3d 1173, 1176 (10th Cir. 1997) (holding that the inability to work "under a few

supervisors within the organizational structure of one major corporation . . . is far

too narrow to constitute" a limitation in the life activity of working); *Palmer v.*

*Circuit Court of Cook County*, 117 F.3d 351 (7th Cir. 1997) ("[A] personality

conflict with a supervisor or coworker does not establish a disability within the

meaning of the disability law, . . . even if it produces anxiety and depression, as

such conflicts often do.").   Therefore, viewing the evidence in the light most

favorable to Kaopua, the court concludes that Kaopua was not limited in the major

life activity of working and was not disabled.

2.  The Defendants offered Kaopua reasonable accommodation

Regardless of whether Kaopua had a disability within the meaning of

the Rehabilitation Act, the Defendants offered him a reasonable accommodation.

Kaopua acknowledges that the Defendants eventually accommodated him but argues that they refused to accommodate him for a period of approximately eight months.  The undisputed evidence demonstrates, however, that the Defendants attempted to accommodate Kaopua almost immediately upon his alleged injury and that the Defendants responded to each request for accommodation by giving Kaopua exactly what he requested.

At the earliest, Kaopua requested accommodation from the Defendants on October 25, 2001.  There is no evidence regarding what accommodation Kaopua may have requested at this time.  The record shows that on November 13, 2001, the Defendants transferred both Kaopua and Abad, effective December 2, 2001, to different fire stations.  Both men were moved approximately twenty miles from Fire Station 11 to fire stations where they would not respond to the same emergencies and would not otherwise come into contact with each other.

On January 25, 2002,  Kaopua's psychologist sent the Defendants a letter that, viewed in the light most favorable to Kaopua, could be interpreted as a request for accommodation.  The letter stated only that Kaopua required "an appropriate resolution to the ongoing threat of violence originating in Captain

Kaopua's work environment[.]"  Plaintiff's Ex. P.  At this point, the Defendants had already transferred Kaopua and Abad away from each other.

Kaopua did not renew his request for accommodation until April 24, 2002 when his attorney sent a letter to the FFD stating that "it is apparent . . .[that] appropriate therapeutic intervention, including work place accommodation would both speed [Kaopua's] recovery and his return to work."  Plaintiff's Ex. K.  The letter also indicated that Kaopua was unhappy with his transfer to a different fire station.  *Id.*  The FFD promptly responded to this letter on May 3, 2002 and asked Kaopua's attorney what sort of accommodation Kaopua was seeking.  Defendants' Ex. 23 at 244.  There is no evidence that Kaopua followed up on the Defendants' request.

It was not until July 2002 that Kaopua made a straightforward request for accommodation.  Kaopua's attorney sent the Defendants a letter requesting that they assure Kaopua that he could return to a safe work environment and that they allow him to return to his old fire station.  The Defendants responded promptly in a letter that assured Kaopua that he would be safe at work and informed him that he would be able to return to his old fire station when he was ready to work again.  Thus, the Defendants provided Kaopua with every accommodation he sought as soon as they learned of his requests.

30

On August 27, 2002, Kaopua's attorney submitted yet another request for accommodation, this time seeking details from the Defendants as to how they would ensure Kaopua's safety. The FFD responded on September 16, 2002 in a letter that reiterated in greater detail what they had already told Kaopua they had done. The letter stated that Abad had been assigned to a different station than Kaopua, that Kaopua and Abad should not have cause to come into contact with one another, and that Kaopua could return to Fire Station 11 as he requested. Defendants' Ex. 27.

Kaopua contends that he was not provided with an accommodation until the September 16, 2002 letter. It is hard to imagine, however, what more the Defendants could have done to accommodate him along the way. The Defendants acted quickly after the October 2001 threat from Abad to ensure that Kaopua and Abad would not come into contact with one another at work. As soon as Kaopua began making specific requests for accommodation, he was granted everything he sought. Thus, the court concludes that, even if Kaopua was disabled, the Defendants offered him a reasonable accommodation in a timely fashion.

## IV.  CONCLUSION

For the reasons discussed herein, the Defendants' motion is GRANTED. As this order disposes of all outstanding matters in this case, the clerk

of the court is instructed to enter judgment in favor of the Defendants and close the

case file.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 11, 2006.



_J. Michael Seabright_
_United States District Judge_

_Kaopua v. Federal Fire Department et. al._, Civ. No. 04-00723 JMS/KSC
Order Granting Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment